COBB, Chief Justice.
 

 Antonio Ben Espinoza and Antonio Espinoza d/b/a Jabez Land Co. (hereinafter referred to collectively as “Jabez”)
 
 [1]
 
 appeal from the trial court’s judgment in favor of Maxine Rudolph in the amount of $50,000 in compensatory damages and $25,000 in punitive damages. We affirm.
 

 Facts and Procedural
 
 History
 
 [2]
 

 Rudolph is the owner of real property on which is located a single-family residence (“the property”). According to Rudolph, the fair market value of the property is $59,000. For more than 10 years, until January 2007, Rudolph resided in the house on the property. From March 2007 until September 2007, Rudolph leased the property to a tenant, but that lease was terminated when the tenant failed to pay rent in accordance with the lease agreement. Rudolph subsequently put the property up for sale and engaged a real-estate agent for the purpose of selling the property. The sales price listed for the property was $54,000.
 

 In April 2008, Rudolph made the acquaintance of Providence Hooper. After learning that Hooper “knew a little something about real estate,” Rudolph asked Hooper to view the property and to let her know what she thought about it. They visited the property together on May 8, 2008. At the trial of this case, Hooper gave the following description of the condi- ■ tion of the property as it was on May 8, 2008:
 

 “The house was what I call a cottage. It had two bedrooms, a living room and somewhat of a den and kitchen and one bathroom. It had beautiful old wood floors. It was the kind of house that a young couple would purchase and do a little work on it, and it was a starter house, and maybe open up some walls, and it would be a very nice house that you could build equity and then move on.... [I]t was a '50s house. There is no perfect house. It was a good house. It was what people in the real estate business would say it has good bones.”
 

 Washington Mutual Bank
 
 [3]
 
 held a mortgage on the property. Historically, Wash
 
 *406
 
 ington Mutual had paid the property taxes on the property. However, it did not pay the taxes due in 2007, and, on May 20, 2008, the property was sold at a tax sale to Espinoza and Edwin Marks,
 
 [4]
 
 as agents of TAG-South Property Renewal Company (“TAG-South”).
 
 [5]
 

 On approximately May 23, 2008, Jabez rented the residence to Josea Gonzales and Mark Gomez. Gonzales, Gomez, and their families moved into the residence on May 23, 2008. During the entire time they occupied the property, Jabez collected rent from them in the amount of $450 per month.
 

 On May 30, 2008, Espinoza, as agent for TAG-South, filed in the Jefferson County Probate Office a document titled “Notice of Lien Statement of Lien [sic],” which stated:
 

 “TAG-South Property Renewal Co. filed this statement in writing, verified by the oath of Antonio B. Espinoza, with a mailing address of 1116 20th Street South, # 323, Birmingham, Alabama and who has personal knowledge of the facts herein set forth:
 

 “That said TAG-South Property Renewal Co. who is the entity that purchased a tax certificate on the below described property in a tax sale at the Jefferson County Courthouse, claims a lien upon [the property].
 

 “The lien is claimed, separately and severally, as to both the buildings and improvements thereon, and the said land. That said lien is claimed to secure an indebtedness of $9,987.45 ... with interest, from the 22nd day of May 2008,[
 
 6
 
 ] for work, repairs, and improvements. The name of the owner and proprietor of the said property is Maxine H. Rudolph and the name under which the property is assessed is Maxine H. Rudolph.”
 

 Around May 27, 2008, Rudolph’s realtor telephoned and asked her if she had leased the property to tenants. Rudolph responded that she had not. The realtor then informed Rudolph that some vehicles were parked on the property and that the realtor’s “for sale” sign was missing from the yard. On June 1, Rudolph went to the property and confirmed that people were living there.
 

 After some investigation, Rudolph learned that the Jefferson County tax collector had sold the property to TAG-South for delinquent taxes in the amount of $234.41. On June 18, 2008, Rudolph obtained a certificate of redemption from the probate office after making a payment of $251.59. Meanwhile, according to Espinoza, on June 5, 2008, TAG-South transferred its interest in the property to Jabez by quitclaim deed.
 

 On June 10, 2008, counsel for Rudolph sent a letter to TAG-South, Marks, and Espinoza, informing them that Rudolph had redeemed the property, demanding that the property be vacated, and threatening litigation in the event the property was not surrendered. A copy of Rudolph’s certificate of redemption was enclosed with the June 10, 2008, letter.
 

 On June 13, 2008, Jabez sent the following letter to Rudolph via her counsel:
 

 “This correspondence is in follow up to your letter dated June 10, 2008. All
 
 *407
 
 property rights for [the property] that were obtained as a result of the valid May 2008 tax sale that occurred at the courthouse in Jefferson County Alabama have been assigned to Jabez Land Co.
 

 “You have made several representations in your letter dated June 10, 2008. Those representations are libelous, reprehensibly false and evidence of a reckless disregard for the peace and quiet enjoyment of the tenants residing at [the property]
 

 “Restated, Jabez Land Co. has ownership and equitable rights in the property.... This property has been leased to tenants and demand is hereby made that you immediately cease and desist "with your breach of the peace and trespassing.”
 

 On June 20, 2008, counsel for Rudolph again sent a letter to Marks, Espinoza, and TAG-South demanding possession of the property.
 

 On June 28, 2008, accompanied by Hooper, Rudolph went to Espinoza’s business address and found him there. Rudolph explained to him in person that she had redeemed the property and that she wanted to know who was living in her house. Espinoza invited her to be seated and informed her that he would speak with her shortly. Espinoza then gathered up some papers, went outside the business, got into a vehicle, and drove away. Rudolph telephoned the police and asked to file a report.
 

 Shortly thereafter, just as a police officer arrived to take Rudolph’s report, Espinoza returned. Espinoza spoke to the officer before Rudolph did. He informed the officer that he wanted to file a police report on Rudolph and that he wanted to obtain a restraining order to keep her off the property. Espinoza also told the officer that Rudolph and Hooper were “drama queens,” and he asked to have them arrested. The officer did not arrest them.
 

 On June 24, 2008, counsel for Rudolph sent a letter to Jabez, again stating that the property had been redeemed, requesting the names of the occupants, and demanding that the property be vacated and possession returned to Rudolph.
 

 On June 80, 2008, Jabez sent a letter to Rudolph, stating:
 

 ‘You have falsely communicated to my tenants they have no right to be there. You have also continued to harass me and my tenants. I have filed a police report and in follow up to my previous correspondence, this letter serves to again notify you that Jabez Land Co. has ownership and equitable rights in [the property].”
 

 On July 2, 2008, Jabez filed a three-count complaint in the name of “Jabez Land Co.”
 
 [7]
 
 against Rudolph in the Jefferson Circuit Court, Bessemer Division. In the first count of the complaint, Jabez sought a judgment declaring void Rudolph’s redemption of the property. In the second count of the complaint, Jabez sought to quiet title to the real property or, in the alternative, a judicial sale of the property to enforce the lien filed by TAG-South. In the third count of the complaint, Jabez sought a judgment awarding civil damages against Rudolph for alleged tortious interference with Jabez’s business relations with the tenants.
 

 On July 7, 2008, Rudolph filed an answer. Paragraph 16 of Rudolph’s answer
 
 *408
 
 was not separately designated as a counterclaim, but stated:
 

 “[Jabez] is indebted to [Rudolph] in the amount of Five Thousand ... Dollars ... for use and occupancy of [Rudolph’s] property.”
 

 When she filed her answer, Rudolph did not submit the filing fee required for filing a counterclaim.
 
 See
 
 § 12 — 19—71(a)(8), Ala. Code 1975.
 

 On July 7, 2008, Rudolph also filed a motion to strike Jabez’s complaint on grounds that “Jabez Land Co.,” the named plaintiff, is not a legal entity and is not licensed or qualified to do business in the State of Alabama. In addition, also on July 7, 2008, Rudolph filed a separate “emergency motion” seeking immediate possession of the property and an order directing Jabez to provide her with the names of the tenants residing on the property.
 

 On July 22, 2008, Jabez filed a verified document styled “First Amended Complaint and Answer to Counterclaim.” In it, Jabez reasserted the claims in its original complaint seeking a declaratory judgment, alleging tortious interference with business relations, and seeking to quiet title or, in the alternative, a judicial sale. Further, Jabez added claims against Rudolph alleging tortious interference with a contractual relationship, slander, defamation, and libel. These additional claims were based on allegations that Rudolph had contacted Jabez’s tenants, asserted that she was the rightful owner of the property, and demanded that the tenants vacate the property. In addition, Jabez included an “Answer to Counter-claim of [Rudolph],” in which Jabez denied Rudolph’s allegation that Jabez was indebted to Rudolph in the amount of $5,000 for the use of the property. Jabez also asserted 25 separately numbered affirmative defenses to Rudolph’s counterclaim.
 

 On August 14, 2008, the trial court entered an order denying Rudolph’s motion to strike Jabez’s complaint. On August 15, 2008, Rudolph filed a “Motion for Emergency Hearing” regarding her earlier “emergency motion” seeking immediate possession of the property.
 

 On September 2, 2008, Rudolph filed an “Amended Answer” adding additional defenses and expressly asserting as counterclaims the following causes of action: ejectment, trespass, statutory action in the nature of ejectment, and slander of title. Further, under a theory of unjust enrichment, Rudolph sought to recover mortgage payments she had been making on the property while Jabez’s tenants were occupying it. Rudolph sought punitive damages and compensatory damages in conjunction with her counterclaims. When she filed her “Amended Complaint,” Rudolph did not pay the filing fee required for filing a counterclaim.
 
 See
 
 § 12-19-71(a)(8), Ala.Code 1975.
 

 On September 12, 2008, the trial court entered an order granting Rudolph’s motion for immediate possession of the property and directing Jabez and the occupants to vacate the property.
 

 On September 23, 2008, Jabez filed a document styled “Notice of Dismissal Without Prejudice and Release of All Claims,” which stated: “Plaintiff Jabez Land Co. hereby dismisses without prejudice and releases all claims in the above action.”
 

 On September 25, 2008, the trial court entered an order stating that Jabez’s notice of dismissal “shall be treated as a motion to dismiss.” Further, the trial court granted the motion but dismissed the action “with prejudice.”
 

 On September 26, 2008, Rudolph filed a motion requesting the trial court to amend or to set aside its order dismissing the
 
 *409
 
 action. Rudolph argued that “the case is not due to be dismissed until such time as there has been an adjudication of the issues presented by [Rudolph] in her counterclaim.”
 

 On October 3, 2008, Josea Gonzales was murdered in the residence on the property. That same day, Mark Gomez, his family, and Gonzales’s family vacated the property. According to Espinoza, as he was driving past the property on the day of the murder, he saw that police were at the property and went inside to interpret for them. According to Espinoza, when he went into the house on the day of the murder, “blood was all over the carpet,” “it was pretty bad,” and “the house was in horrible condition.” As part of the investigation into the murder, the police cut out and removed portions of carpeting from the house.
 

 On the night of October 3, 2008, after the police had finished gathering evidence, Rudolph entered the house, where she saw that holes had been cut in the carpet. According to Rudolph, the inside of the house was “filthy.” The back door was open, the kitchen sink and the pipes beneath it were “torn up,” the doors had been removed from the kitchen cabinets, the refrigerator was “messed up,” the eyes on the stove had been burned, the interior walls required painting, and “there were roaches everywhere.” Two of the four sides of the outside of the house, which had been blue, had been almost entirely painted yellow. One corner of one of these two walls was only partially painted yellow, with yellow streaks left by a paint roller that had been drawn across the original blue paint. Two sides of the house were still the original blue color.
 

 On October 23, 2008, Jabez filed a response opposing Rudolph’s motion to amend or set aside the order dismissing the action. The basis of Jabez’s opposition was that Rudolph had not paid the filing fee required for filing a counterclaim.
 

 On October 31, 2008, the trial court held a hearing on Rudolph’s motion to amend or set aside the order dismissing the action. Following the hearing, the trial court entered the following order:
 

 “1. The Order of Dismissal ... is corrected to reflect that [Jabez’s] claims are dismissed
 
 without prejudice.
 

 “2. [Rudolph] shall have fourteen (14) days to pay the requisite fee for her counterclaim.
 

 “3. Upon the [payment] of the filing fee by [Rudolph] within said 14 days the Circuit Clerk is directed to change the status of this ease on the Alacourt system from ‘disposed’ to ‘active.’ ”
 

 Rudolph paid the filing fee, and, on February 5, 2009, the case was tried without a jury. At trial, Rudolph testified that the fair market value of the property at the time she listed it with the real-estate agent was $59,000 and that the fair rental value of the property was $600 per month. Rudolph further estimated that the property was worth “maybe” $25,000 after the tenants vacated it. She estimated that the cost of repairing the damage to the house, including replacing the carpet, repairing the kitchen cabinets, repairing the plumbing, and repainting the interior and exteri- or, would be approximately $75,000.
 

 Providence Hooper testified that, when she visited the property with Rudolph in May 2008, she noticed no obvious problems with the plumbing, the appliances were approximately three years old and “clean,” and the exterior of the house looked like it had been painted “fairly recently, maybe [within] a year or two.” There were no obvious problems with water damage or leakage from the roof, the gutters were in good shape, and the kitchen cabinets were “nice white cabinets.” However, Hooper
 
 *410
 
 noted that, although the interior walls were “in good shape,” they “maybe needed a little paint on them.” She stated that, if she were to get the house ready to move into for herself, she would remove a wall to “open up the kitchen,” paint the walls, and wax the wood floors.
 

 Espinoza, however, testified that, shortly before purchasing the property on May 20, 2008, he viewed the property and found that the house was not suitable to live in. According to Espinoza, at that time, the property appeared abandoned, drug paraphernalia was strewn about the house, the exterior doors were standing open, sewage had backed up into the house, the roof was damaged, the interior walls and floor had been damaged by water from a roof leak, part of a fence in the yard had been damaged, the gutters needed replacing, some of the windows were broken, and the stove and refrigerator were broken. Espinoza also testified that the wiring in the house was so faulty that “every time you went to plug in something, a spark shot out.” In addition, according to Espinoza, boards and bricks on the exterior of the house were deteriorating and needed replacing. Espinoza testified that he “paid a guy” to make repairs. However, the majority of his testimony was either vague or contradictory with regard to the extent of the repairs, whom he had hired to make the repairs, how much the repairs cost, when he paid for the repairs, and whether he paid for the repairs with cash, check, or a credit card.
 

 Espinoza testified that the lien he filed on behalf of TAG-South on May 30, 2008, for “$9,987.95 ... with interest, from the 22nd day of May 2008,” represented some of the cost of repairs and improvements to the property. He produced a number of receipts from various hardware stores to substantiate this allegation, some of which were marked with dates before May 20, 2008 (some from 2007 and 2006), and others bore dates subsequent to October 3, 2008, the date he relinquished possession of the property.
 
 [8]
 
 When asked about the discrepancy in the dates on the receipts, Espinoza explained that his “bookkeeping [was] sloppy” and admitted that he could not tell whether the receipts he produced represented expenses related to Rudolph’s property, his own personal or business property, or other houses he had purchased at tax sales.
 

 Before Espinoza left the stand, the trial court questioned Espinoza, resulting in the following exchange:
 

 “The Court: I have a question I’m going to ask you, sir, the same question I asked you back in September, back in my office, and you didn’t answer it.... What made you think you had any claim to this property once you were notified that it had been redeemed?
 

 “[Espinoza]: Okay. If I can correct the mistake I made then, my only claim to the property is that they had owed me for the work that I had put in to the property. I didn’t have a problem with saying, okay, this is your property, if you don’t want to sell it, if you want to keep it, it’s your property, you can take it back. However, I have made your property better than it was before I took over. So it’s only fair that you guys pay me for the work I have done. I don’t work for free. And I apologize that I did not correct that.... At that time, I
 
 *411
 
 think I probably should not have assumed that I would automatically be understood.... At that time, I was expecting Ms. Rudolph to say, put me in contact with the person who did it, and I was just going to explain all the problems, or say just pay her, and I was expecting her and I to come to an agreement for reimbursement for my expenses, and then I would have said take your property back if you don’t want to sell it....
 

 “The Court: ... You know, I wasn’t asking that question back in my office to be funny because this is a lawsuit. It’s serious. And I asked you what makes you think that this lady was not entitled to possession of her property. This was back in September.... This all happened — she redeemed it June 18.... And all that time you still have folks in there. You claim a lien and cause to be proven at trial. Okay. But you make a lot of allegations in this lawsuit....
 

 “[Espinoza]: Yes, sir. What I should have explained, and I apologize for just assuming that I would be understood or assuming that the process would be understood, I should have explained that I’m in complete agreement that Ms. Rudolph is entitled to possession of the house, but not until I’m paid what is owed to me, and I apologize I did not make that more clearer [sic].”
 

 On February 16, 2009, the trial court entered the following order:
 

 “This matter came before the Court for trial February 5, 2009.... Sworn testimony and other evidence was presented and the court finds and orders as follows:
 

 “1. [Espinoza] obtained a possessory interest in land via a tax sale, he being the highest bidder for the [property] on May 20, 2008....
 

 “2. [Rudolph] soon thereafter discovered that her mortgage company had not paid her property taxes as was its custom, and redeemed the dwelling on June 18, 200[8].
 

 “3. [Rudolph] notified [Jabez] of the fact that she had redeemed the property immediately after she redeemed the property.
 

 “3 [sic]. Despite this notification [Ja-bez] continued to rent [Rudolph’s] dwelling to tenants without submitting any monies to [Rudolph] and for some reason still unbeknownst to the court filed this frivolous lawsuit on [July 2, 2008]. “4. [Espinoza] testified during the trial but the [C]ourt cannot seriously accept as true anything he testified to. The Court finds that as of the date [Rudolph] obtained the Certificate of Tax Sale the dwelling in question was in good, livable condition and that by the time [Jabez] relinquished possession of the dwelling on October 3, 2008 (i.e., the night one of [Jabez’s] tenants was murdered in the dwelling and the police concluded their investigation) the dwelling was in essentially a trashed condition.
 

 “WHEREFORE, the Court orders as follows:
 

 “1. Judgment is rendered in favor of Maxine Rudolph and she is awarded $50,000.00 compensatory damages and $25,000.00 punitive damages against defendant Antonio B. Espinoza individually and Antonio B. Espinoza doing business as Jabez Land Company.
 

 “2. Costs of this action are taxed against Antonio B. Espinoza individually and Antonio B. Espinoza doing business as Jabez Land Company.
 

 “3. Any requested relief not granted herein shall be deemed denied.”
 

 On March 17, 2009, Jabez filed a motion for a new trial and a motion to alter, amend, or vacate the judgment. On the
 
 *412
 
 same day, the trial court entered an order denying the motions.
 

 On April 28, 2009, Jabez filed a notice of appeal to this Court from the trial court’s February 16, 2009, judgment.
 

 Standard of Review
 

 When evidence is presented ore tenus, the trial court is “ ‘unique[ly] positioned] to directly observe the witnesses and to assess their demeanor and credibility.’ ”
 
 Ex parte T.V.,
 
 971 So.2d 1, 4 (Ala.2007) (quoting
 
 Ex parte Fann,
 
 810 So.2d 681, 683 (Ala.2001)). Therefore, a presumption of correctness attaches to a trial court’s factual findings premised on ore tenus evidence.
 
 Ex parte J.E.,
 
 1 So.3d 1002, 1008 (Ala.2008). When evidence is taken ore tenus and the trial judge makes no express findings of fact, this Court will assume that the trial judge made those findings necessary to support the judgment.
 
 Transamerica Commercial Fin. Corp. v. AmSouth Bank, N.A.,
 
 608 So.2d 375, 378 (Ala.1992) (citing
 
 Fitzner Pontiac-Buick-Cadillac, Inc. v. Perkins & Assocs., Inc.,
 
 578 So.2d 1061 (Ala.1991)). We will not disturb the findings of the trial court unless those findings are “clearly erroneous, without supporting evidence, manifestly unjust, or against the great weight of the evidence.”
 
 Gaston v. Ames
 
 514 So.2d 877, 878 (Ala.1987) (citing
 
 Cougar Mining Co. v. Mineral Land & Mining Consultants, Inc.,
 
 392 So.2d 1177 (Ala.1981)). “‘The trial court’s judgment [in cases where evidence is presented ore ten-us] will be affirmed, if, under any reasonable aspect of the testimony, there is credible evidence to support the judgment.’”
 
 Transamerica,
 
 608 So.2d at 378 (quoting
 
 Clark v. Albertville Nursing Home, Inc.,
 
 545 So.2d 9, 13 (Ala.1989), and citing
 
 Norman v. Schwartz,
 
 594 So.2d 45 (Ala.1991));
 
 see also Ex parte Perkins,
 
 646 So.2d 46 (Ala.1994).
 

 “However, the
 
 ore tenus
 
 standard of review has no application to a trial court’s conclusions of law or its application of law to the facts; a trial court’s ruling on a question of law carries no presumption of correctness on appeal.”
 
 Ex parte J.E.,
 
 1 So.3d at 1008 (citing
 
 Perkins,
 
 646 So.2d at 47, and
 
 Eubanks v. Hale, 752
 
 So.2d 1113, 1144-45 (Ala.1999)). This Court ‘“review[s] the trial court’s conclusions of law and its application of law to .the facts under the de novo standard of review.’ ”
 
 Id.
 
 (quoting
 
 Washington v. State,
 
 922 So.2d 145,158 (Ala.Crim.App.2005)).
 

 Analysis
 

 I. Rudolph’s Alleged Failure to Move for Leave to Assert Counterclaims
 

 Jabez contends that Rudolph did not assert counterclaims in her original answer.
 
 [9]
 
 Jabez further contends that, on September 2, 2008, when Rudolph filed an amended answer containing new counterclaims, she did not obtain leave of court to do so. Jabez argues that those additional counterclaims were compulsory and that Rudolph waived them by not asserting them in her original answer or obtaining leave of court to assert them in a subsequent pleading.
 
 See
 
 Rule 13(a) and (f),
 
 *413
 
 Ala. R. Civ. P. Based on these alleged defects, Jabez contends that Rudolph’s counterclaims were not properly before the trial court when it dismissed the action. According to Jabez, the trial court therefore exceeded its discretion by reinstating Rudolph’s counterclaims after dismissing the action.
 

 The record contains no indication that Jabez asserted these arguments before the trial court. Therefore, we will not reverse the judgment of the trial court on the basis of Rule 13(f), Ala. R. Civ. P.
 
 White Sands Group, L.L.C. v. PRS II, LLC,
 
 998 So.2d 1042, 1057 (Ala.2008) (“It is well known that ‘we cannot reverse the judgment of the trial court based on an argument not made below and urged for the first time on appeal.’
 
 Singleton v. State Farm Fire & Cas. Co.,
 
 928 So.2d 280, 285 (Ala.2005).”);
 
 Polytec, Inc. v. Utah Foam Prods., Inc.,
 
 489 So.2d 683, 686 (Ala.1983) (holding that “any objection for failure to obtain leave of the court [was] waived” because “[n]one of the counterdefendants objected to the counterclaim on this ground” before the trial court).
 

 II. Rudolph’s Initial Failure to Tender the Fee Required When Filing Counterclaim
 

 Jabez argues that, when the trial court dismissed the action upon Jabez’s “Notice of Dismissal,” the trial court had not acquired jurisdiction over Rudolph’s counterclaims because, it argues, she had not paid the filing fee required by § 12-19 — 71(a)(8), Ala.Code 1975. “A court is obligated to vigilantly protect against deciding cases over which it has no jurisdiction. ...”
 
 Crutcher v. Williams,
 
 12 So.3d 631, 635 (Ala.2008). The parties may not waive lack of subject-matter jurisdiction, and subject-matter jurisdiction may not be conferred by consent.
 
 Ex parte Alabama Dep’t of Human Res.,
 
 999 So.2d 891, 894 (Ala.2008) (citing
 
 Ex parte Davis,
 
 930 So.2d 497, 499-500 (Ala.2005)).
 

 In support of its argument that the trial court did not obtain jurisdiction over Rudolph’s counterclaims until Rudolph paid the requisite filing fee, Jabez relies on cases construing § 12-19-70, Ala.Code 1975. Section 12-19-70(a) provides:
 

 “There shall be a consolidated civil filing fee, known as a docket fee, collected from a plaintiff
 
 at the time a complaint is filed
 
 in circuit court or in district court.”
 

 (Emphasis added.)
 

 In
 
 De-Gas, Inc. v. Midland Resources,
 
 470 So.2d 1218 (Ala.1985), the plaintiffs did not pay the docket fee required by § 12-19-70(a) until nearly two months after they had filed their complaint. The statute of limitations on the action had expired between the time the complaint was filed and the time the plaintiffs paid the docket fee. In considering whether the plaintiffs’ action commenced for statute-of-limitation purposes before the payment of the docket fee, this Court observed that “ § 12-19-70 requires the payment of filing fees
 
 ... at the time of filing the complaint
 
 ” and that “the defendant in an initial action cannot know of the existence of the suit against him” until the fees are paid and certain judicial action is taken on the complaint. Accordingly, this Court concluded that the payment of the fees required by § 12-19-70 “is a jurisdictional prerequisite to the commencement of an action for statute of limitations purposes.”
 
 De-Gas,
 
 470 So.2d at 1222.
 
 But cf.
 
 Rule 3(a), Ala. R. Civ. P. (“A civil action is commenced by filing a complaint with the court.”).
 

 Section 12-19-71(a)(8), Ala.Code 1975, requires the clerk to collect a filing fee for
 
 *414
 
 a counterclaim filed in the circuit court.
 
 [10]
 
 Jabez argues that, like the docket fee mandated by § 12-19-70, the filing fee for a counterclaim is “jurisdictional.”
 
 See DeGas,
 
 470 So.2d at 1222. Jabez suggests that a counterclaim is not truly “filed,” and thus does not become part of the action, until the filing fee required by § 12-19-70 is paid.
 
 [11]
 

 Although § 12-19-70 expressly requires that the
 
 docket fee
 
 must be “collected from [the] plaintiff at the time [the]
 
 complaint
 
 is filed,” § 12-19-70(a), Ala.Code 1975 (emphasis added), the legislature has not expressly provided that a
 
 filing fee
 
 must be collected at the time a
 
 counterclaim
 
 is filed.
 
 Cf De-Gas,
 
 470 So.2d at 1220 (“ ‘There
 
 shall
 
 be a consolidated civil filing fee ...
 
 collected
 
 from a plaintiff
 
 at the time a complaint is filed
 
 .... ’ ... It was the obvious intent of the legislature to require that either the payment of this fee or a court-approved verified statement of substantial hardship accompany the complaint
 
 at the time of filing.”
 
 (quoting § 12-19-70, Ala.Code 1975)). Therefore, when Rudolph delivered the counterclaim to the clerk, the counterclaim was “filed” and became a part of the action over which the trial court had jurisdiction.
 
 See
 
 Rule 5(e), Ala. R. Civ. P. (“The filing of papers with the court as required by these rules shall be made by filing them with the clerk of the court.... ”);
 
 Rubin v. Department of Indus. Relations,
 
 469 So.2d 657 (Ala.Civ. App.1985) (“‘[A] pleading or other paper may be said to have been duly filed when it is delivered to the proper filing officer.’ ” (quoting
 
 Covington Bros. Motor Co. v. Robinson,
 
 239 Ala. 226, 194 So. 663 (1940)));
 
 cf. Cunningham v. Lavoie,
 
 874 So.2d 1068, 1071-72 (Ala.2003) (distinguishing the statutory fee for filing a claim in the probate court from the docket fee statutorily required to be submitted with complaint in a civil action in the circuit or district court);
 
 DeGas,
 
 470 So.2d at 1222 (distinguishing the docket fee submitted with a complaint from the filing fee required in conjunction with the filing of an appeal).
 

 Therefore, the trial court did not err by reinstating Rudolph’s counterclaims on the condition that she pay the filing fee.
 
 [12]
 

 See
 
 Rule 41(a)(2), Ala. R. Civ. P. (“[A]n action shall not be dismissed at the plaintiffs instance save upon order of the court and upon such terms and conditions as the court deems proper. If a counterclaim has been pleaded by a defendant prior to the service upon the defendant of the plaintiffs motion to dismiss, the action may be dismissed but the counterclaim shall remain pending for adjudication by the court.”).
 

 
 *415
 

 III. Validity of Redemption of Property
 

 Jabez argues that the redemption of Rudolph’s property was invalid because, according to Jabez, Rudolph did not redeem her property in strict conformance with § 40-10-122, Ala.Code 1975, which governs the manner of redemption when land is sold at a tax sale to a party other than the State. Section 40-10-122(a) requires the redemptioner to “deposit with the judge of probate ... the amount of money for which the lands were sold, with interest payable at the rate of 12 percent per annum from date of sale.... ” It is undisputed that Rudolph satisfied the redemption requirements of § 40-10-122(a).
 

 Section 40-10-122(c) provides that, with respect to “property [that] contains a residential structure at the time of the [tax] sale,” the redemptioner must pay the purchaser the amounts of “[a]ll insurance premiums paid or owed by the purchaser for casualty loss coverage on the residential structure[,] with interest,” and “the value of all preservation improvements made on the property determined in accordance with this section with interest on the value at 12 percent per annum.” Jabez did not pay insurance premiums on the property. Further, we infer that the trial court determined either that Jabez made no “preservation improvements” or that any such improvements had no value.
 
 Fitzner Pontiac-Buick-Cadillac, Inc.,
 
 578 So.2d at 1063 (“Because this case was tried
 
 ore tenus,
 
 this Court will assume that the trial court made the findings that were necessary to support its judgment....”). Such a finding is amply supported by the record.
 
 Clark v. Albertville Nursing Home, Inc.,
 
 545 So.2d 9, 13 (Ala.1989) (“The trial court’s judgment in [an ore tenus] ease will be affirmed, if, under any reasonable aspect of the testimony, there is credible evidence to support the judgment.”). Therefore, Rudolph is not required to pay Jabez anything to satisfy the requirements of § 40-10-122(c).
 

 Section 40-10-122(d) provides:
 

 “The proposed redemptioner shall make written demand upon the purchaser of a statement of the value of all permanent or preservation improvements as applicable made on the property since the tax sale. In response to written demand made pursuant to this subsection, within 10 days from the receipt of such demand, the purchaser shall furnish the proposed redemptioner with the amount claimed as the value of such permanent or preservation improvements as applicable; and within 10 days after receipt of such response, the proposed redemp-tioner either shall accept the value so stated by the purchaser or, disagreeing therewith, shall appoint a referee to ascertain the value of such permanent or preservation improvements as applicable. The proposed redemptioner shall in writing (i) notify the purchaser of his or her disagreement as to the value; and (ii) inform the purchaser of the name of the referee appointed by him or her. Within 10 days after the receipt of such notice, the purchaser shall appoint a referee to ascertain the value of the permanent or preservation improvements as applicable and advise the proposed redemptioner of the name of the appointee. Within 10 days after the purchaser has appointed his or her referee, the two referees shall meet and confer upon the award to be made by them. If they cannot agree, the referees shall at once appoint an umpire, and the award by a majority of such body shall be made within 10 days after the appointment of the umpire and shall be final between the parties.”
 

 Jabez argues that the redemption was invalid because Rudolph did not make a written demand for a statement of the
 
 *416
 
 value of improvements, and the parties did not resolve their dispute over moneys allegedly due Jabez for improvements according to the process required in § 40-10 — 122(d). Not until his postjudgment motion did Jabez argue that the redemption was invalid because Rudolph had not submitted a written request for an itemization of Jabez’s expenses or because she had otherwise failed to comply with the requirements of § 40 — 10—122(d). “ ‘[A] trial court has the discretion to consider a new legal argument in a post-judgment motion, but is not required to do so.’ ”
 
 Special Assets, L.L.C. v. Chase Home Fin., L.L.C.,
 
 991 So.2d 668, 678 (Ala.2007) (quoting
 
 Green Tree Acceptance, Inc. v. Blalock,
 
 525 So.2d 1366, 1369 (Ala.1988)). There is no indication that the trial court considered the merits of the legal argument raised for the first time in Jabez’s post-judgment motion, and we will not presume that it did.
 
 See Special Assets,
 
 991 So.2d at 678. Jabez offers no justification for the delayed presentation of his argument. The trial court did not exceed its discretion in refusing to grant Jabez’s postjudgment motion on the basis of Rudolph’s failure to request an itemization of expenses Jabez incurred to improve the property.
 
 See Green Tree Acceptance, Inc. v. Blalock,
 
 525 So.2d 1366, 1370 (Ala.1988) (“Based on the record before this Court on appeal, we conclude that there was no justification given by Green Tree for failing to raise the argument prior to its post-judgment motion.”).
 

 For these reasons, we will not reverse the trial court’s judgment on the basis of Jabez’s contention that Rudolph failed to comply with § 40-10-122 in redeeming the property.
 

 TV. Damages
 

 Jabez argues that the trial court erred by awarding Rudolph $50,000 in compensatory damages and $25,000 in punitive damages. Having thoroughly considered the evidence as shown in the record in the light most favorable to the trial court’s judgment,
 
 see Transamerica, supra,
 
 we conclude that the damages awarded by the trial court are supported by the evidence.
 
 Yeager v. Lucy,
 
 998 So.2d 460, 463 (Ala.2008) (“ ‘ “[W]here the evidence has been [presented]
 
 ore tenus ...
 
 [this Court] ... will affirm the judgment if, under any reasonable aspect, it is supported by credible evidence.” ’ ” (quoting
 
 Reed v. Board of Trs. for Alabama State Univ.,
 
 778 So.2d 791, 795 (Ala.2000), quoting in turn
 
 Raidt v. Crane,
 
 342 So.2d 358, 360 (Ala.1977))). Accordingly, we affirm the trial court’s decision as to the amount of damages.
 

 Conclusion
 

 The judgment of the trial court is affirmed.
 

 AFFIRMED.
 

 LYONS, WOODALL, STUART, SMITH, BOLIN, PARKER, MURDOCK, and SHAW, JJ., concur.
 

 [1]
 

 .On July 2, 2008, Espinoza filed this suit against Maxine Rudolph in the name of "Ja-bez Land Co.” as sole plaintiff. Contrary to the allegations of its complaint and verified amended complaints, "Jabez Land Co.” is not a company qualified to do business in the State of Alabama. According to Espinoza's testimony at the trial in this case, "Jabez Land Co.” is the name of a sole proprietorship by which Espinoza does business. On January 15, 2009, Rudolph amended her counterclaim against Jabez Land Co. to substitute Espinoza as the counterclaim defendant, alleging that Espinoza was the "true defendant” and that "Jabez Land Co.” was "nothing more than a name” under which Espinoza conducted some of his business. On February 16, 2009, the trial court entered a judgment "against Antonio B. Espinoza individually and Antonio B. Espinoza doing business as Jabez Land Company.” On April 28, 2009, Espinoza filed a notice of appeal on behalf of "Jabez Land Co. and Antonio Espinoza.” We have restyled the appeal to reflect the true nature of the parties.
 

 [2]
 

 . In setting forth the facts of this case, we are mindful that, "[ujnder the
 
 ore tenus
 
 standard of review, we must accept as true the facts found by the trial court if there is substantial evidence to support the trial court’s findings.”
 
 Beasley v. Mellon Fin. Servs. Corp.,
 
 569 So.2d 389, 393 (Ala.1990). Further, where the record is silent as to the trial court’s findings of fact on a disputed issue, we assume that the trial court made those findings necessary to support the judgment.
 
 Transamerica Commercial Fin. Corp. v. AmSouth Bank, N.A.,
 
 608 So.2d 375, 378 (Ala.1992).
 

 [3]
 

 . In late 2007 and early 2008, Washington Mutual suffered severe financial losses. Thereafter, during a series of national finan
 
 *406
 
 cial crises, Washington Mutual became the largest bank to fail in the history of the United States.
 

 [4]
 

 .At trial, Espinoza testified that Marks is his cousin.
 

 [5]
 

 . TAG-South is another name under which Espinoza conducts business.
 

 [6]
 

 . Although Espinoza’s statement of lien claims a lien from May 22, 2008, the tax sale took place on May 20, 2008.
 

 [7]
 

 . Until October 23, 2008, Espinoza personally signed all pleadings and filings on behalf of the sole plaintiff, Jabez Land Co. Espinoza is not a member of the Alabama State Bar, and. on October 23, 2008, Andrew LaPlante entered an appearance as counsel for Jabez Land Co.
 

 [8]
 

 . Espinoza produced in court, and testified at length about, a number of receipts marked with dates that did not correspond with the period during which he and his tenants possessed the property. However, with one exception, only receipts from the period of Ja-bez’s possession of the property were entered into evidence. The total value of the receipts entered into evidence for that period falls far short of $9,987.95.
 

 [9]
 

 . The record, however, speaks for itself. Rudolph did not designate as a counterclaim that portion of her answer asserting that Ja-bez was indebted to her “in the amount of Five Thousand ... Dollars ... for use and occupancy of [the] property.” However, Ja-bez clearly understood that allegation to be, and treated it as, a counterclaim — as is evident from Jabez’s extensive responsive plead-tog designated as an "Answer to [Rudolph’s] Counterclaim.”
 
 See
 
 Rule 8(f), Ala. R. Civ. P. ("All pleadings shall be so construed as to do substantial justice.”);
 
 cf.
 
 Rule 8(c), Ala. R. Civ. P. (“When a party has mistakenly designated a defense as a counterclaim or a counterclaim as a defense, the court on terms, if justice so requires, shall treat the pleading as if there had been a proper designation.”).
 

 [10]
 

 . Section 12-19-71(a)(8) provides:
 

 "The filing fees which shall be collected in civil cases shall be:
 

 [[Image here]]
 

 (8) Two hundred ninety-seven dollars ($297) for a counterclaim, cross claim, third party complaint, a third party motion, or an action for a declaratory judgment filed in a civil action of the circuit court other than cases filed on the domestic relations docket of the circuit court.”
 

 [11]
 

 . Jabez makes no allegation that the statute of limitations ran before Rudolph paid the filing fee.
 

 [12]
 

 .We note that, when the requirements of § 12-19-71 have not been satisfied, the trial court may stay the time for answering the counterclaim or conducting discovery or litigating the counterclaim until the fee is paid or may make such other orders as are reasonable and necessary to ensure payment. Consequently, a counterclaim defendant is not without incentive to take note of, and timely object to, the nonpayment of the filing fee.