SHAW, Justice.
In these consolidated appeals, the Alabama Department of Corrections (“the department”), various officials of the department, and Governor Robert Bentley,[1] the *285 defendants below (hereinafter collectively referred to as “DOC”), appeal, in case no. 1111588, from the trial court’s determination limiting certain deductions from work-release earnings for inmates. In case no. 1120264, Jerry Mack Merritt, as sole representative of the plaintiff class, cross-appeals, raising numerous challenges to the trial court’s final judgment. We dismiss the appeal in case no. 1120264 as untimely filed; in case no. 1111588, we reverse and remand.

Facts and Procedural History

As previously established by this Court in Ex parte Alabama Department of Corrections, 74 So.3d 25 (Ala.2011) (“Ex parte DOC”), the pertinent factual and procedural history of this matter is as follows:
“ ‘[The department] appealed] from the trial court’s judgment determining that the [department] violated [its] regulations by overcharging work-release inmates for transportation costs and by misinterpreting State law by withholding more money from the gross pay of inmates’ work-release earnings than it was authorized to do under State law. Jerry Mack Merritt, Thomas Layton, Johnny Walker, Warren R. Robinson, and Darrell Williams (hereinafter referred to collectively as “the plaintiffs”), inmates or former inmates in the custody of the department who participated in a work-release program, cross-appeal from .the trial court’s judgment determining that [the department] was authorized to charge work-release inmates for certain goods or services and to charge all inmates a fee for self-initiated medical care and a fee for drug testing conducted by entities other than the department.
“ ‘... The department is authorized to operate a work-release program for inmates. Pursuant to that program, inmates are permitted “to leave the confines [of their places of incarceration] unaccompanied by a custodial agent for a prescribed period of time to work at paid employment.” § 14-8-2(a), Ala.Code 1975. Work-release inmates are confined in their respective prisons during the hours they are not at work. § 14-8-2(a). Inmates who are qualified to take part in the program have the option of whether to participate.
“‘Since 1992, § 14-8-6, Ala.Code 1975, has authorized the department to withhold up to 40% of an inmate’s work-release earnings for costs “inei-dent to the inmate’s confinement.” Before 1992, § 14-8-6 provided that the maximum amount of earnings the department was allowed to withhold from an inmate’s work-release earnings was 32.5% of those earnings. The record includes a copy of Admin. Reg. No. 410, promulgated by the department, which, in § YII.B., provides that, “[a]s authorized by statute, thirty-two and one-half percent (32 ½%) of work releasees’ gross earnings will be deducted by the Department of Corrections to assist in defraying the cost of his/her incarceration.” (Emphasis in original.) Richard Allen, the [then] commissioner of the department, testified by deposition that, after § 14-8-6 was amended to allow the department to withhold up to 40% of an inmate’s work-release earnings, the department’s policy was to withhold up to 40%, rather than up to 32.5%, of an inmate’s work-release earnings even *286 though Admin. Reg. No. 410, § VII.B., had not been formally-amended. However, that unwritten policy haS been ratified by the commissioner; The copy of Admin. Reg. No. 410 submitted into evidence is dated 1997, and it includes a handwritten notation at § VII.B. stating; “Changed to 40%, see 14-8-6.” The balance of a work-release inmate’s earnings is deposited into his prison account.
“ ‘Administrative Regulation No. 410 also authorizes the department to charge inmates participating in the work-release program for the cost of transportation to and from their places of employment. Pursuant to Admin. Reg. No. 410, § VII.B., inmates using transportation provided by the department to and from their work-release jobs may be assessed $2 for a one-way trip and $4 for a round trip. At the time of trial, however, inmates were being charged transportation costs of $2.50 for a one-way trip and $5 for a round trip.
“ ‘The department also charges work-release inmates a laundry fee for cleaning the “free-world” clothes they wear to their work-release jobs. There is no charge for laundry services for prison-issued clothing....
[[Image here]]
“ ‘The department has promulgated a number of other regulations authorizing certain charges at issue in this case. Pursuant to Admin. Reg. No. 601, the department is authorized to charge an inmate a $3 co-pay for “self-initiated” medical visits. If the visit is initiated by medical staff, a physician referral, the warden, or another prison official, the inmate is not charged the co-pay. The regulation also specifies that under no circumstances would an inmate be denied access to health care because of an inability to pay the co-pay. Allen said that the purpose of the co-pay is to discourage malingering among inmates.
“ ‘Pursuant to Admin. Reg. No. 440, § V.F.3., the department is authorized to charge an inmate the cost of a urine drug test performed by an independent laboratory to confirm a positive test for illegal drugs. At the time of trial, that cost was $31.50. If the results of the independent test were negative for illegal substances, the inmate was not charged the fee. Admin. Reg. No. 440, § V.E.5.
“‘After a hearing, the trial court entered a judgment [on July 15, 2009,] approving the practice of charging work-release inmates the co-pay for “self-initiated” medical care, approving the drug-testing fee charged to inmates when a drug test is administered to confirm the results of a previous drug test indicating that the inmate has tested positive for use of an illegal substance, and approving the laundry fee.
“ ‘On the other hand, the trial court found that the department had failed to amend its regulations, as required by the regulations themselves, and that the department’s “informal” amendment of the regulations- was invalid. Therefore, the trial court held, the department did not have the authority to withhold more than 32.5% of a work-release inmate’s earnings to defray the costs of incarceration or to increase the charges an inmate pays for transportation costs from $2 to $2.50 for one-way trips and from $4 to $5 for round trips to the inmate’s place of employment. The trial court enjoined the department from withholding 40% of an inmate’s work-re *287 lease earnings or from charging inmates more for transportation than the amount stipulated in Admin. Reg. No. 410, § VII.B. However, the trial court stayed its injunction for 180 days to allow the department to formally amend[ ] its regulations to bring them in line with current practices.
“ ‘Because the trial court found that, under the terms of the department’s current regulations, the department was allowed to withhold only 32.5% of an inmate’s work-release earnings, the issue whether [the department], by charging fees for certain goods and services in addition to withholding funds from an inmate’s work-release earnings, was exceeding the 40% cap under § 14-8-6 was moot. However, the court went on to “hold” that, in amending § 14-8-6, the Legislature intended “to place an absolute cap on the monies [the department] could take from inmates: ‘In no event shall the withheld earnings exceed 40% of the earnings of the inmates.’ (emphasis added).” The trial court stated: “Once the 40 percent threshold is reached, [the department] is prohibited by statute from taking any more money, whether it is for costs of confinement, costs of work release, or any other fee or expense.”
“ ‘The trial court further held that § 14-8-6 authorized the department to withhold a percentage of a work-release inmate’s earnings “actually deposited in the institution by the employer” and not a percentage of an inmate’s gross income. Therefore, the trial court held, the department had misinterpreted the statute when it promulgated Admin. Reg. No. 410, § VII.B., which allows the department to withhold 32.5% of a work-release inmate’s gross earnings.
“ ‘The trial court noted that the parties had agreed to resolve liability issues before presenting evidence on damages or class certification. Because the amount of damages relating to the issues of transportation costs and income withholding had yet to be determined, the trial court certified its judgment on the issue of liability as final pursuant to Rule 54(b), Ala. R. Civ. P. DOC appealed]; the plaintiffs cross-appeal[ed].’
“[Alabama Dep’t of Corr. v. Merritt,] 74 So.3d [1] at 6-8 [ (Ala.Civ.App.2010) (footnotes omitted) ].
“The Court of Civil Appeals issued an opinion on June 18, 2010; it subsequently withdrew that opinion and issued another opinion on rehearing. The Court of Civil Appeals first addressed the propriety of the Rule 54(b), Ala. R. Civ. P., certification in light of the fact that the issue of damages had not yet been adjudicated. The Court of Civil Appeals held that the plaintiffs, inmates and former inmates in the custody of the department who participated in a work-release program, cannot recover money damages because the department is entitled to sovereign or State immunity; therefore, it reasoned, the judgment was properly certified as final and was reviewable by that court. Specifically, the Court of Civil Appeals addressed DOC’s argument that, although the amount of damages had not yet been determined on the issue of its collection of transportation costs and its withholding of inmates’ work-release earnings in excess of the amount provided in the regulations of the department, the judgment was final as to those issues, as well as to the issues resolved in favor of DOC and for which no damages were pending, because, it said, any claim by the inmates for a refund is barred by the doctrine of sovereign immunity. The *288 inmates had argued that sovereign or State immunity under Art. I, § 14, Ala. Const.1901, does not apply to actions for damages brought against State officials sued individually when it has been alleged that the officials acted fraudulently, in bad faith, beyond their authority, or in a mistaken interpretation of law and that the trial court had found that the individual defendants (who were sued both in their official and individual capacities) acted under a mistaken interpretation of law. The Court of Civil Appeals determined that the determinative issue for Rule 54(b) purposes was whether the inmates’ claims for refunds based upon the alleged improper collection of certain money from work-release inmates because of the individual defendants’ mistaken interpretations of law are essentially claims against the State seeking money damages. The Court of Civil Appeals, citing Stark v. Troy State University, 514 So.2d 46 (Ala.1987), and Ex parte Carlisle, 894 So.2d 721 (Ala.Civ.App.2004), held that because a judgment awarding refunds of the improperly collected money would affect the financial status of the State treasury, the action for refunds cannot be maintained. Because the inmates cannot recover damages in this action, the Court of Civil Appeals concluded that the judgment was properly certified as final and, therefore, was reviewable.”
74 So.3d at 27-30 (footnote omitted).
This Court, however, concluded that the trial court’s judgment was incapable of certification pursuant to Rule 54(b), Ala. R. Civ. P., because the plaintiffs’ claim seeking money damages had not been fully adjudicated in that those damages remained undetermined. 74 So.3d at 30-31. We therefore remanded the case to the Court of Civil Appeals, directing that the case be dismissed and the trial court instructed to vacate its Rule 54(b) certification. 74 So.3d at 31.
Thereafter, the plaintiffs filed in the trial court both a “Motion for Class Certification” and a “Motion for Contempt and Escrow of Funds.” In an order dated May 10, 2012, the trial court ultimately dismissed the plaintiffs’ claims for damages in the form of refunds “due to immunity” and scheduled a hearing on any remaining issues, particularly including class certification.[2] In response, the plaintiffs filed a “postjudgment” motion requesting that the trial court “alter, amend or vacate” the May 10 order, which motion appears to have been directed solely at the trial court’s immunity ruling. Thereafter, the trial court granted the plaintiffs’ motion seeking class certification pursuant to Rule 23, Ala. R. Civ. P.[3] In light of the trial court’s July 15, 2009, order, stating that they had prevailed on their claims seeking declaratory and injunctive relief, the plaintiffs moved for an award of attorney fees and costs totaling $627,041.60.
Following a series of hearings, the trial court ultimately issued on July 24, 2012, a “Final Order” in which it “reaffirm[ed] its. *289 opinion of 7/15/09[4] except in two respects.” More specifically, the trial court appeared to adopt the reasoning of the Court of Civil Appeals, as set out above, as to “those issues which ... are now moot.” In addition, the trial court, again relying on the rationale applied by the Court of Civil Appeals, agreed “that DOC’s interpretation of Section 14 — 8—6[, Ala.Code 1975,] is reasonable and [that] it can withhold 40% of an inmate’s gross earnings.” Finally, the trial court denied the plaintiffs’ request for attorney fees. DOC timely filed its notice of appeal on September 4, 2012.
On October 9, 2012,[5] the plaintiffs filed, pursuant to Rule 62, Ala. R. Civ. P., a “Renewed Motion for Escrow” in which they contended that “the trial court exceeded its limited jurisdiction on remand, when it changed the wording of its [July 15, 2009,] order respecting liability from 32.5% of net earnings to 40% of gross earnings” and requested that the trial court direct the department to cease collecting amounts exceeding 32.5% of the plaintiffs’ net earnings or that it direct the department to escrow excess sums collected since the trial court’s order purportedly became final. The trial court subsequently denied the motion; Merritt purports to appeal from that decision.

Standard of Review

[1,2] “ ‘[A] trial court’s ruling on a question of law carries no presumption of correctness on appeal.’ Ex parte J.E., 1 So.3d [1002] at 1008 [ (Ala.2008) ] (citing [Ex parte ] Perkins, 646 So.2d [46] at 47 [ (Ala.1994) ], and Eubanks v. Hale, 752 So.2d 1113, 1144-45 (Ala.1999)). This Court ‘ “review[s] the trial court’s conclusions of law and its application of law to the facts under the de novo standard of review.” ’ Id. (quoting Washington v. State, 922 So.2d 145, 158 (Ala.Crim.App.2005)).”
Espinoza v. Rudolph, 46 So.3d 403, 412 (Ala.2010).

Discussion

I. Case No. 112026Í

Although the parties do not raise any argument regarding this Court’s jurisdiction to hear the appeal in case no. 1120264, “jurisdictional matters are of such magnitude that we take notice of them at any time and do so even ex mero motu.” Nunn v. Baker, 518 So.2d 711, 712 (Ala.1987). See also Ex parte Smith, 438 So.2d 766, 768 (Ala.1983) (“Lack of subject matter jurisdiction may not be waived by the parties and it is the duty of an appellate court to consider lack of subject matter jurisdiction ex mero motu.”). As an initial matter, we must, therefore, consider whether Merritt’s notice of appeal was timely filed so as to properly invoke the appellate jurisdiction of this Court. See, e.g., Rudd v. Rudd, 467 So.2d 964, 965 (Ala.Civ.App.1985) (“The timely filing of the notice of appeal is a jurisdictional act.”).
*290 Pursuant to Rule 4(a)(1), Ala. R.App. P., Merritt’s notice of appeal was required to be filed “with the clerk of the trial court within 42 days ... of the date of the éntry of the judgment or order appealed from.” Here, the trial court’s “Final Judgment” was entered on July 24, 2012; therefore, Merritt’s notice of appeal — in the absence of some type of tolling event— must have been filed no later than September 4, 2012. Merritt’s notice, however, was not filed until November 20, 2012, over two months after that deadline and almost four months after the entry of the trial court’s order.[6]
As more particularly described above, the plaintiffs did file, on October 9, 2012, a motion pursuant to Rule 62, Ala. R. Civ. P. That motion, however, was not the type of postjudgment motion that would have tolled the time for filing a notice of appeal. See, e.g., Rule 4(a)(3), Ala. R.App. P. (“The filing of a post-judgment motion pursuant to Rules 50, 52, 55 or 59 of the Alabama Rules of Civil Procedure ... shall suspend the running of the time for filing a notice of appeal.”). Moreover, even construing the plaintiffs’ renewed escrow motion as a postjudgment motion pursuant to those rules fails to remedy the jurisdictional problem here, because such a motion must be filed no later than 30 days after the entry of the judgment being challenged. See Rules 50(b), 52(b), 55(c), and Rule 59(b), Ala. R. Civ. P. The motion, was, instead, clearly filed well after the expiration of the specified 30-day period. Because Merritt failed to timely file his notice of appeal, this Court has no jurisdiction to consider it; we therefore dismiss the appeal in case no. 1120264. See Rule 2(a)(1), Ala. R.App. P. (“An appeal shall be dismissed if the notice of appeal was not timely filed to invoke the jurisdiction of the appellate court.”).

II. Case No. 1111588

In case no. 1111588, DOC argues that the trial court’s final order, to the extent that it incorporated that court’s pri- or holding that the 40% withholding threshold permitted by § 14-8-6, Ala.Code 1975, represents an absolute cap on what the department may withhold, constituted reversible error. More specifically, DOC contends that § 14-8-6 “limits only what the Department may withhold to defray part of the costs of confinement, and does not prohibit additional charges for items that are not incident to confinement,” including incidental costs associated with an inmate’s participation in the department’s optional work-release program. (DOC’s brief, at 14.) Giving the language of § 14-8-6 its plain and ordinary meaning, we agree.
“In determining the meaning of a statute, this Court looks to the plain meaning of the words as written by the legislature. As we have said:
“ ‘ “Words used in a statute must be given their natural, plain, ordinary, and commonly understood meaning, and where plain language is used a court is bound to interpret that language to mean exactly what it says. If the language of the statute is unambiguous, then there is no room for judicial construction and the clearly expressed intent of the legislature must be given effect.” ’
“Blue Cross & Blue Shield v. Nielsen, 714 So.2d 293, 296 (Ala.1998) (quoting IMED Corp. v. Systems Eng’g Assocs. Corp., 602 So.2d 344, 346 (Ala.1992)); see also Tuscaloosa County Comm’n v. Deputy Sheriffs’ Ass’n, 589 So.2d 687, 689 (Ala.1991); Coastal States Gas *291 Transmission Co. v. Alabama Pub. Serv. Comm’n, 524 So.2d 357, 360 (Ala.1988); Alabama Farm Bureau Mut. Cas. Ins. Co. v. City of Hartselle, 460 So.2d 1219, 1223 (Ala.1984); Dumas Bros. Mfg. Co. v. Southern Guar. Ins. Co., 431 So.2d 534, 536 (Ala.1983); Town of Loxley v. Rosinton Water, Sewer, & Fire Protection Auth., Inc., 376 So.2d 705, 708 (Ala.1979). It is true that when looking at a statute we might sometimes think that the ramifications of the words are inefficient or unusual. However, it is our job to say what the law is, not to say what it should be. Therefore, only if there is no rational way to interpret the words as stated will we look beyond those words to determine legislative intent. To apply a different policy would turn this Court into a legislative body, and doing that, of course, would be utterly inconsistent with the doctrine of separation of powers. See Ex parte T.B., 698 So.2d 127, 130 (Ala.1997).”
DeKalb Cnty. LP Gas Co. v. Suburban Gas, Inc., 729 So.2d 270, 275-76 (Ala.1998).
Section 14-8-6 provides:
“The employer of an inmate involved in work release shall pay the inmate’s wages directly to the Department of Corrections. The department may adopt regulations concerning the disbursement of any earnings of the inmates involved in work release. The department is authorized to withhold from an inmate’s earnings the cost incident to the inmate’s confinement as the department shall deem appropriate and reasonable. In no event shall the withheld earnings exceed ⅛0 percent of the earnings of the inmate. After all expenses have been deducted by the department, the remainder of the inmate’s earnings shall be credited to his or her account with the department. Upon his or her release all moneys being held by the department shall be paid over to the inmate.”
(Emphasis added.)
In accordance with the foregoing statute, the department is authorized to withhold from an inmate’s earnings reasonable “cost[s] incident to the inmate’s confinement.” The statute limits the department’s withholding powers, however, in that “the withheld earnings,” i.e., the costs “incident to the inmate’s confinement” that the department deducts, may not exceed 40% of the inmate’s earnings.
Section 14-8-6 allows the department to adopt regulations concerning inmate earnings. In accordance, the department adopted such regulations, including amended Admin. Code (Dep’t of Corr.) Reg. No. 410, which deducts transportation and laundry costs associated with the inmate’s employment after the 40% threshold provided for in § 14-8-6 has been reached, on the ground that the transportation fees- are not “costs incident to the inmate’s confinement.” Similarly, Admin. Code (Dep’t of Corr.) Reg. Nos. 440 and 601, as adopted by the department, permit deductions in excess of the 40% threshold for costs associated with drug-testing fees and co-pays for inmate-initiated medical visits, respectively, because those are also not “costs incident” to confinement.
Although, as DOC concedes and Merritt and Layton argue, the phrase “costs incident to confinement” is not defined by § 14-8-6, applying the aforementioned rules .of statutory construction,'we conclude that the definition supplied by DOC is reasonable. Specifically, DOC defines
“the term to mean those costs incurred by the Department in the ordinary course of maintaining physical custody of an inmate in a correctional institution, and not those costs arising from the inmate’s voluntary employment, his own wrongdoing, ordinary living expenses, or *292 other obligations of the inmate (such as child support or restitution).”
(DOC’s reply brief, at p. 20.) As DOC notes, Merritt and Layton offer nothing to show that the definition used by the department deviates from the plain meaning of the Code section. DeKalb County, supra. The record establishes that the average cost of confinement associated with each inmate is $43 per day. Evidence in the record also suggests that, as a result of the inmates’ participation in work release in areas where a public-transportation option is not available, the department incurs significant additional expenses, including, but not limited to, work-related transportation,[7] that it would otherwise not have and that the deductions from the inmates’ work-release earnings does not begin to cover those attendant costs.
Commissioner Thomas, during his testimony below, defined “the costs of confinement” as including, at least in part, the following: “Electricity, gas, water, repairs on the buildings, salaries of employees and benefits, food, processing food, transporting food, gas, paper products, health care, mental health care.”[8] He further stated that the transportation fees “[are] not related to the confinement itself’ but that those fees “relate[] directly to [the inmate’s] ... employment.” He similarly explained that the applicability of the $3 medical co-pay for self-initiated inmate medical visits is determined by medical personnel and is aimed at discouraging “malingering.” As to fees associated with the administration of drug tests,[9] the record shows that the inmate is charged for the cost of the confirmation testing only if the inmate tests positive for illegal drug use on an institution-administered drug screen and that result is subsequently confirmed by “a free-world laboratory.” The charges challenged by the plaintiffs necessarily resulted not from their confinement but from when, pursuant to their voluntary participation in the work-release program, they opt to and are temporarily permitted to leave that confinement and to work at “free-world” employment.
Merritt and Layton respond that the use of “incident to” in § 14-8-6 broadens the scope of the threshold to encompass “any costs associated with the inmate’s confinement, whether he is, in fact, at that very moment, physically confined.” (Merritt and Layton’s reply brief, at p. 33.) We disagree. Specifically, contrary to Merritt’s and Layton’s contentions, the necessity of transportation to and from free-world employment is not incident to an inmate’s confinement. It is, instead, incident to that inmate’s decision to participate in a voluntary program offered by the department. Further, neither costs related to illegal drug use while incarcerated nor costs related to purportedly unnecessary medical care arise from an inmate’s *293 confinement within the department. Instead, each of the challenged deductions results from a voluntary and unnecessary undertaking by the inmate. Thus, we hold that the plain language of the statute does not prohibit the department from collecting, over and above the 40% threshold established by § 14-8-6, costs that are not incident to the inmate’s confinement, including transportation costs and other fees stemming from the inmate’s participation in the department’s optional work-release program.
In consideration of the foregoing, we find that the department’s interpretation of § 14-8-6 as permitting its collection of charges, which are not incident to the inmate’s confinement, in excess of the 40% withholding cap established by that statute is both reasonable and consistent with the statutory language. We therefore, in appeal no. 1111588, reverse the trial court’s judgment holding to the contrary and remand this matter for further proceedings consistent with this opinion.
1111588 — REVERSED AND REMANDED.
STUART, PARKER, MAIN, and WISE, JJ., concur.
MOORE, C.J., and BOLIN and MURDOCK, JJ., dissent.
BRYAN, J., recuses himself.*
1120264 — APPEAL DISMISSED.
MOORE, C.J., and STUART, BOLIN, PARKER, MURDOCK, MAIN, and WISE, JJ., concur.
BRYAN, J., recuses himself.*

. To the extent that any of the original named defendants have, during the pendency of the *285 present litigation, been succeeded in public office, appropriate substitutions have been made. See Rule 43(b), Ala. R.App. P.

. The trial court also dismissed Robinson v. ADOC (CV-08-416), one of the underlying matters that it had previously consolidated with these matters.

. The class certified by the trial court consists of the following:
"All inmates of [the department] who are classified as work release inmates and who are subject to having money deducted from their Prisoner's Money on Deposit ('PMOD') accounts in an amount greater than permitted by § 14-8-6 of the Code of Alabama; and all inmates who are subject to a $3.00 medical co-pay and a drug testing fee.”

. As set out above, the trial court had, in its July 15, 2009, order, approved the department’s practice of charging both co-pays for self-initiated medical visits and drug-testing fees and approved the laundry fees; had concluded that formal amendment to the department's regulations was necessary in order for the department to withhold the statutorily permitted amounts; and had concluded that the 40% threshold provided for in § 14-8-6, Ala.Code 1975, represented an absolute cap on the department’s ability to withhold from an inmate's earnings.

. Although the certificate of service included with the plaintiffs’ renewed motion reflects that it was both electronically filed and served on October 9, 2012, the case-action summary prepared by the clerk of the trial court and included with the record on appeal reflects that the motion was received in the clerk's office on October 11, 2012.

. Merritt’s notice also was not filed within two weeks of the filing date of DOC’s timely notice of appeal. See Rule 4(a)(2), Ala. R.App. P.

. In addition to actual fuel costs, testimony suggested that the department increased its fleet size in order to accommodate inmates participating in work release, which similarly necessitated additional maintenance costs to the vehicles making up that fleet.

. Former commissioner of DOC Richard Allen similarly noted in his earlier deposition testimony that "the cost of incarceration” the deductions are intended to cover includes "food, clothing, shelter, police protection, medical expenses, dental expenses, mental health care, clothing, whatever an inmate needs when he is incarcerated in an Alabama penitentiary.” Commissioner Allen also testified that, in addition to the enumerated items, costs incident to incarceration are "whatever it takes to run the prison,” including his own salary.

. Unlike transportation and civilian-laundry costs, charges for self-initiated medical visits and drug tests are institution-wide and are not limited merely to the department’s work-release participants.