BOLIN, Justice.
Richard E. Chesnut and Betty B. Ches-nut petitioned this Court for a writ of certiorari seeking review of the Court of Civil Appeals’ opinion affirming the Madison Circuit Court’s summary judgments in favor of the City of Huntsville (“the City”), the Board of Zoning Adjustment of the City of Huntsville, Denton-Niemitz Realty, LLC, and Guild Building & Remodeling, LLC. See Chesnut v. Board of Zoning Adjustment, 208 So.3d 609 (Ala.Civ.App. 2015).

Facts and Procedural History

The Court of Civil Appeals set out the procedural history as follows:
“Richard E. Chesnut and Betty B. Chesnut appeal from two separate judgments of the Madison Circuit Court that were entered against them in connection with their challenge of building permits (‘the permits’) issued for the construction of a house next door to the Ches-nuts’ house.
“On June 3, 2013, the Chesnuts filed a civil action, case no. CV-13-901203 (‘the civil action’), in the Madison Circuit Court against the City of Huntsville (‘the city’), Denton-Niemitz Realty, LLC, and Guild Building & Remodeling, LLC (the two latter entities are hereinafter referred to collectively as ‘the builders’); we hereinafter refer to the Madison Circuit Court, insofar as it presided over the civil action, as ‘the trial court.’[1] On September 27, 2013, the builders filed a motion for a summary judgment, which the city joined on October 1, 2013. On December 23, 2013, the builders filed counterclaims against the Chesnuts, alleging slander of title and seeking sanctions against them pursuant to the Alabama Litigation Accountability Act. On February 2, 2014, the Chesnuts filed a motion to dismiss the builders’ counterclaims pursuant to Rule 12(b)(2) and (6), Ala. R. Civ. P. As discussed more fully below, the trial court entered a summary judgment in favor of the city and the builders on the Chesnuts’ claims on March 14, 2014. On April 16, 2014, the builders submitted a notice of dismissal to the trial court, in which they stated that they were voluntarily dismissing their counterclaims that were still pending against the Chesnuts. On May 16, 2014, the Chesnuts filed a motion to alter, amend, or vacate the judgment. That motion was denied by operation of law, pursuant to Rule 59.1, Ala. R. Civ. P. The Chesnuts filed a timely notice of appeal to our supreme court, which transferred the appeal to this court pursuant to § 12-2-7(6), Ala.Code 1975. This court assigned appeal no. 2140043 to the appeal from the civil action.
“On July 8, 2013, while the civil action was pending, the city filed a motion to dismiss the civil action on the ground that the Chesnuts had not appealed the issuance of the permits to the Board of Zoning Adjustment of the City of Huntsville (‘the board’). Therefore, the city argued, the Chesnuts had not exhausted their administrative remedies before filing the civil action. On July 31, 2013, the Chesnuts filed an appeal of the issuance of the permits with the board. The board determined that the Chesnuts’ appeal was untimely. On August 30, 2013, the Chesnuts appealed the board’s decision (‘the administrative appeal’) to the Madison Circuit Court and the administrative appeal was assigned case no. CV-13-902031; we hereinafter refer to the Madison Circuit Court, insofar as it presided over the administrative appeal, *628 as ‘the circuit court’.[2] The board filed a motion to dismiss, which was converted tó a motion for a summary judgment. On April 9, 2014, the circuit court entered a summary judgment upholding the board’s determination that the Ches-nuts’ appeal of the issuance of the permits had been untimely. The Chesnuts filed a timely motion to alter, amend, or vacate the circuit court’s judgment. The circuit court denied the postjudgment motion, and the Chesnuts filed a timely notice of appeal to our supreme court. Our supreme court transferred the appeal to this court pursuant to § 12t-2-7(6). This court assigned appeal no. 2140042 to the appeal from the administrative appeal. On the Chesnuts’ motion, this court consolidated the appeals from the civil action and from the administrative appeal.
Chesnut, 208 So.3d at 611-13.
The Court of Civil Appeals first addressed the appeal in case no. 2140043, the civil action, and whether there was a final judgment in that the summary judgment did not address the counterclaims asserted by Denton-Niemitz Realty and Guild Builders (hereinafter collectively referred to as “the builders”). A month after the March 14, 2014, summary judgment was entered, the builders filed a notice of dismissal of their counterclaims pursuant to Rule 41, Ala. R. Civ. P. The Court of Civil Appeals concluded that the summary judgment was final, reasoning:
“The procedural posture of this case at the time the builders filed their notice of dismissal presents an unusual set of circumstances in relation to the filing of a notice of dismissal pursuant to Rule 41(a)(l)(i)[, Ala. R. Civ. P.]. Although a summary judgment had already been entered on the builders’ and the city’s motion for a summary judgment, the builders did not even file their counterclaims against the Chesnuts until after they had filed their motion for a summary judgment. Rule 41(a)(1) makes clear that the ‘adverse party’ must have filed an answer or a motion for a summary judgment before the notice of dismissal is filed. At the time the builders filed their notice of dismissal, the Ches-nuts, as the adverse parties to the counterclaims, had not filed an answer to the pending counterclaims or a motion for a summary judgment as to the counterclaims.
“Although we have found no Alabama law directly on point, we note that this court has stated that ‘[a] bona fide motion is certainly not a pleading [including an answer] within the intendment of Rule 7 of the Alabama Rules of Civil Procedure.’ Kuhns v. Coussement, 412 So.2d 779, 782 (Ala.Civ.App.1981). Moreover, federal cases interpreting Rule 41(a), Fed.R.Civ.P., which is similar to Rule 41(a), Ala. R. Civ. P., have held that ‘[a] motion to dismiss for failure to state a claim for relief does not have the same preclusionary effect’ as the filing of an answer for purposes of Rule 41(a). Roddy v. Dendy, 141 F.R.D. 261, 262 (S.D.Miss.1992)(citing Carter v. United States, 547 F.2d 258 (5th Cir. 1977)); see also Nix v. International Ass’n of Machinists & Aerospace Work *629 ers, 452 F.2d 794, 797-798 (5th Cir. 1972)(same). As mentioned, ‘[t]he committee comments to Rule 41 state that this rule is substantially the same as the federal rule, and we normally consider federal cases interpreting the federal rules of procedure as persuasive authority.’ Hammond v. Brooks, 516 So.2d 614, 616 (Ala.1987). Thus, based on the authority cited, we conclude that the Chesnuts’ Rule 12(b) motion to dismiss, which, we note, contained no affidavits or other materials that might have converted the motion to dismiss to a motion for a summary judgment, did not constitute an answer.
“We are cognizant that Rule 41 is designed to limit voluntary dismissals “ ‘to an early stage of the proceedings before issue is joined.’ ” Riverstone Dev. Co. [v. Nelson], 91 So.3d [678] at 681 [(Ala.2012)]. However, because of the builders’ delay in filing their counterclaims, those issues had not been ‘joined’ at the time the March 2014 summary judgment was entered on the Chesnuts’ claims against the city and the builders. Because the Chesnuts had not filed an answer to or a motion for a summary judgment regarding the builders’ counterclaims, and because the merits of the counterclaims had not been reached or the ‘issues joined,’ we conclude that, under the rare circumstances of this case, the trial court was not required to enter an order ‘granting’ the builders’ notice of dismissal of the counterclaims. Accordingly, the summary judgment entered in the civil action is a final judgment for purposes of appeal.”
Chesnut, 208 So.2d at 615-16.
The Court of Civil Appeals then turned to the merits of case no. 2140043, the appeal from the civil action, setting out the following facts:
“The materials the parties submitted in favor of and in opposition to the motion for a summary judgment filed by the builders and joined by the city in the civil action indicate the following. In 1983, the Chesnuts purchased a house and the adjacent lot to the east of their house, which was in a Huntsville neighborhood that had been established in 1908. The neighborhood is zoned as a ‘Resident 1-B’ district. In October 2012, one of the builders, Denton-Niem-itz Realty, LLC (‘Denton-Niemitz’), purchased the house on the west side of the Chesnuts’ house. The house Denton-Niemitz purchased was a single-family house with the usual sewerage, water, and utility connections, a driveway, and a landscaped yard. In other words, it was a ‘developed lot.’ On October 24, 2012, Denton-Niemitz obtained a permit to raze the house. Denton-Niemitz hired Guild Building & Remodeling, LLC (‘Guild’), which demolished the Denton-Niemitz house.
“Denton-Niemitz also applied for two building permits that would allow it to construct a new house (‘the new house’) and a detached garage on the lot where the demolished house had stood. Jim McGuffey, the zoning-enforcement coordinator for the city, conducted an investigation to ensure that the new house would meet the applicable zoning ordinances. In his affidavit, McGuffey said that he determined that, because the new house was to be constructed on the site where a single-family house had been and where sewer, water, and utility connections already existed, the new house was being constructed on a ‘developed lot,’ to which a particular setback line applied, as opposed to an ‘undeveloped lot,’ to which a different setback line applied.
“The city’s zoning ordinances applicable to Resident 1-B districts provide *630 that the minimum required depth of a front yard from streets that are not on ‘major arterials’ is 30 feet. 1989 Huntsville Zoning Code, Article 12.2.4. An exception to the 30-foot setback line is found in Huntsville Zoning Code, Article 73.7.4, which provides:
“ ‘Front yards. Where the developed lots within one hundred (100) feet on the same side of the street of any undeveloped lot have a greater or lesser front yard than required herein, the front yard of such undeveloped lot shall be within five (5) feet of the average front yard; provided no front yard shall be less than twenty (20) feet except in a Residence C-l district, and further provided this section shall not apply to lots fronting on major streets as established by the Major Street Plan.’
“On January 29, 2013, the city issued the permits and construction began on the new house. The front of the new house, which has been completed, is 30.17 feet from the front property line, in compliance with Article 12.2.4. In his affidavit, Richard Chesnut stated that, ‘[wjhen framing began on the front portion of the new residence, I realized that the new residence, when completed, would entirely block the view of my home from any vehicular or pedestrian traffic traveling east’ on his street.
“Richard Chesnut contacted McGuffey on May 3, 2013, with his concern that the new house did not comply with the applicable setback-line requirement and requested that the zoning code be enforced. Subsequently, Richard Chesnut had a survey performed on the setback lines of the new house and existing houses on his street and determined that, in his opinion, the new house should have a setback line of 45.68 feet, a difference of 15.51 feet from the actual front of the house. He also met with the builders and other city officials about what he believed was a violation of the zoning code. When no action was taken, the Chesnuts filed the civil action in the trial court on June 3, 2013.
“In entering the summary judgment in the civil action, the subject of appeal no. 2140043, the trial court found that, in his role as the zoning-enforcement officer for the city, McGuffey had determined that the site of the new house was a developed lot and, therefore, was not subject to the provisions of Article 73.7.4. The trial court wrote: ‘In making this determination, [McGuffey] considered the building application, the site plans, house plans, the location, the coverage and buildable area, the nature of the lot, a platted lot equipped with utility lines and sewer access, possessing a building site upon which a prior home existed.’ The trial court stated that McGuffey’s interpretation of the term ‘developed lot’ ‘is reasonable and a permissible construction of the term.’ ”
Chesnut, 208 So.3d at 617-18.
The Chesnuts argued that the Madison Circuit Court (insofar as it presided over the civil action, we refer to the Madison Circuit Court as “the trial court”) erred in entering a summary judgment in the civil action because, they said, Jim McGuffey (the zoning-enforcement coordinator for the City) incorrectly interpreted Articles 12.2.4 and 73.7.4 of the City’s zoning code; that, when McGuffey issued the permits, he used an “extralegal dictionary definition” of “developed” and “undeveloped”; that McGuffey ignored a mandate of the Huntsville City Council that he did not have the power to permit construction that did not conform with the zoning code; and that McGuffey and the City ignored well established rules of statutory construction and ignored their statutory mandate to *631 administer ordinances according to their literal terms.
The Chesnuts agreed that the lot on which the new house was being constructed was a “developed” lot so long as the former house remained standing. However, they contend that as soon as the former house was razed, the site reverted to an undeveloped lot. In support of their contention, the Chesnuts submitted in opposition to the City and the builders’ summary-judgment motion the affidavit of Joseph A. Snoe, a law-school professor who teaches property and land-use planning, who opined that, in context, the use in Article 73.7.4 of the word “ ‘undeveloped’ in its ordinary usage means without a structure.” Accordingly, the Chesnuts contend, the setback exception in Article 73.7.4 was applicable to the new house.
The Court of Civil Appeals noted that, where the facts are undisputed and the matter is one of interpretation or of reaching a conclusion of law, then summary judgment may be proper. The Court of Civil Appeals noted that the terms “undeveloped” and “developed” were not defined in the City’s zoning code, and it turned to rules of statutory construction to give meaning to those terms. It also recognized that interpretations of an act or an ordinance by an administrative agency charged with enforcement of the act or ordinance are not conclusive but are given great weight. The Court of Civil Appeals stated:
“McGuffey explained in his affidavit that his job as zoning-enforcement coordinator requires him to, among other things, review applications for building permits and related permits and issue or decline those permits in conformity with the Huntsville Zoning Code.[3] In making determinations as to whether a specific permit complies with zoning requirements, McGuffey said, he relies on his ‘experience, the context and purpose of the Zoning Ordinance of the City of Huntsville, as I understand and interpret it, and resources including, but not limited to, “[A] Planner’s Dictionary,” ’ a reference book that includes a collection of terms used in all aspects of land-use planning and the preparation of zoning ordinances. ‘A Planner’s Dictionary,’ relevant excerpts of which were attached as exhibits in support of the motion for a summary judgment in the civil action, defines ‘undeveloped land’ as ‘land in its natural state.’ It defines ‘developed property’ as ‘property or a lot upon which significant site improvements, such as utility installations, paving, and in many instances, the construction of one or more structures has occurred.’ McGuffey said that, because a single-family residence had already been on the lot in question, and because ‘sewer and water and utility connections existed on the lot,’ he determined that the site of the new house was ‘developed’ property. The trial court found that McGuffey’s interpretation was ‘a reasonable and permissible construction.’
“In asking this court to reverse the trial court’s judgment, the Chesnuts have essentially asked this court to accept their interpretation of the terms ‘developed’ and ‘undeveloped’ over McGuffey’s interpretation and to hold the trial court in error for accepting an interpretation different than their own. After reviewing the record in the civil action, we conclude that McGuffey’s interpretation of what constitutes ‘developed’ property for purposes of enforcing the city’s zoning code is supported by substantial evidence, and there is no compelling reason to reject that interpretation. See Ex parte Emerald Mountain Expressway Bridge, [L.L.C., 856 So.2d 834 (Ala.2003)].
*632 “As mentioned, in asserting that the trial court erred in entering the summary judgment in favor of the city and the builders in the civil action, the Ches-nuts say that McGuffey did not have the power to permit construction that did not conform to the city’s zoning code. McGuffey, as the city’s zoning-enforcement coordinator, was the person responsible for the day-to-day operations of ensuring that applications for building permits were in compliance with the zoning code. The Chesnuts did not contend that the duty rested with any other person. Furthermore, because McGuffey determined that the site of the new house was a developed lot, the setback line from the front boundary of the property was required to be 30 feet. There is no dispute that the front of the new house is 30.17 feet from the front boundary; thus no variance was required. There is no evidence in the record to suggest that McGuffey exceeded his discretion in authorizing the permits to the builders.
“Similarly, we find no merit to the Chesnuts’ contention that McGuffey improperly referred to ‘A Planner’s Dictionary1 because, they say, it was an ‘extralegal’ dictionary. They cite no authority for the proposition that agencies — or courts — cannot rely on what the Chesnuts call an ‘extralegal’ dictionary definition in interpreting statutes or ordinances. In fact, courts often refer to ‘extralegal’ resources in interpreting statutes. See, e.g., Alabama Dep’t of Revenue v. American Equity Inv. Life Ins. Co., 169 So.3d [1069,] 1074 [(Ala. 2003).] (using definitions found in Meriam-Webster’s Collegiate Dictionary to interpret statutes); Thomas v. Merritt, 167 So.3d 283 (Ala.2013)(same); Board of Zoning Adjustment of Trussville v. Tacala, Inc., 142 So.3d 624, 632 (Ala.Civ.App.2013) (using definitions found in Merriam-Webster’s Collegiate Dictionary to interpret a city’s sign ordinance). In this case, the ordinary — or to use the Chesnuts’ term, ‘literal’ — meaning of ‘develop’ in the context of land usage is ‘to make suitable for commercial or residential purposes.’ Merriam-Webster’s Collegiate Dictionary 341 (11th ed.2003). It is reasonable to believe, therefore, that a cleared lot with sewerage, water, and utility infrastructure in place has been made suitable for commercial or residential purposes — that is, as McGuffey determined, that it is a developed lot.
“Moreover, to prohibit agencies from using definitions peculiar to the subject matter of the agency, in this case zoning and land use — that is, terms of art relevant to zoning matters — would defeat the purpose of giving deference to agencies’ interpretations of their own statutes or ordinances. We conclude that the Chesnuts have failed to demonstrate that the trial court erred in entering a summary judgment in favor of the city and the builders in the civil action, appeal no. 2140043.
Chesnut, 208 So.3d at 620-22.
The Court of Civil Appeals then went on to address case no. 2140042, the appeal from the summary judgment in favor of the City’s Board of Zoning Adjustment (hereinafter “the BZA”), on the ground that the Chesnuts’ appeal was untimely. The Chesnuts argued that the BZA violated their right to procedural due process *633 because, they say, the 15-day period the BZA asserted the Chesnuts had in which to appeal the issuance of the permits was found only in an unpublished resolution adopted by the BZA and was not contained in the zoning code itself. In other words, they argue, they were not given notice of the time in which they had to appeal.
The Court of Civil Appeals noted that in § 11 — 52—80(c), Ala.Code 1975, the legislature authorized municipalities to establish boards of adjustment to hear appeals by aggrieved parties and that the times for taking such appeals should be reasonable. The Court of Civil Appeals noted that Article 92.3 of the City’s zoning code provides that appeals should be filed “within a reasonable time.” Article 92.2 of the City’s zoning code provides that all actions of the BZA “should be public record.” The Court of Civil Appeals stated that a resolution of the BZA adopted in 1992 provides that an appeal shall be filed within 15 days of the date the applicant was aggrieved by the decision of the BZA. The 15-day period for appealing a decision of the BZA is incorporated in the BZA’s bylaws but is not found in the City’s zoning code.
The Court of Civil Appeals stated:
“The board moved to dismiss the Chesnuts’ administrative appeal of its decision to the circuit court. However, because it attached exhibits referencing matters outside the pleadings, the circuit court treated the motion as one for a summary judgment and allowed the Chesnuts to respond. See Rule 12(b), Ala. RApp. P.
“The materials the parties submitted to the circuit court indicated that the permits at issue were granted on January 29, 2013. In its motion, the board pointed out that, by the Chesnuts’ own admission, the latest they became aware of the issuance of the permits was on May 3, 2013, when Richard Chesnut spoke to McGuffey about them. Therefore, the board said, even giving the Chesnuts the benefit of that late date and assuming that the time for their appeal began to run as of the date of their actual knowledge of the permits, an assumption with which this court does not necessarily agree, they had until no later than May 18, 2013, to file a notice of appeal to the board regarding the permits.[4] However, the board said, rather than appealing to the board, the Chesnuts first filed a civil action on June 3, 2013. Not until July 31, 2013, after the board had moved to dismiss the civil action on the ground that the Chesnuts had failed to exhaust their administrative remedies, did the Chesnuts finally file a notice of appeal to the board.
“Even if there is merit to the Ches-nuts’ contention that the board’s failure to ‘publish’ the 15-day requirement prevented them from filing their appeal within the time established by the board, their due-process argument still must fail under the facts of this case. Both § 11 — 52—80(c) of the Alabama Code and Article 92.3 of the city’s zoning code provide that appeals to the board must be made within a ‘reasonable time.’ The Chesnuts lived next door to where the new house was under construction; thus, they were easily able to monitor the day-to-day progress of the construction. Nonetheless, they waited six months after construction began on the new house to appeal the issuance of the permits to the board. Even if the Ches-nuts were given the benefit of calculating the time in which they had to appeal from the date they believed that the new house did not meet zoning requirements, i.e., May 3, 2013, they waited almost an additional three months before filing their notice of appeal to the board. *634 Moreover, the evidence is undisputed that, by the time the Chesnuts filed their notice of appeal to the board, construction on the new house had been completed. We conclude that, as a matter of law, the Chesnuts’ attempt to appeal the issuance of the permits after the construction of the structure at issue had been completed was not reasonable.
“Furthermore, contrary to the Ches-nuts’ assertions, the board and its agents did not act to deprive them of their right to due process. The Ches-nuts’ failure to receive a hearing before the board to challenge the issuance of the permits was caused by their own failure to file a timely challenge, not because of any conduct by the board. Accordingly, the circuit court did not err in entering the summary judgment upholding the board’s determination that the Chesnuts’ appeal was untimely.
Chesnut, 208 So.3d at 623-24.

Discussion

At the outset of our discussion, we note that the Chesnuts filed two separate appeals in the Court of Civil Appeals. In case no. 2140043, the Chesnuts appealed from the trial court’s March 14, 2014, summary judgment in favor of the City and builders, which arose out of the Chesnuts’ complaint alleging that the City did not comply with its zoning ordinance when it issued building permits to the builders who, they said, were violating the front-yard setback lines. In them complaint filed on June 3, 2013, the Chesnuts alleged that they did not have to exhaust their administrative remedies before seeking relief in the trial court. Ultimately, the trial court in case no. 2140043 ruled on the merits of the Chesnuts’ claim regarding the zoning-enforcement coordinator’s interpretation of the zoning ordinance involving the front-yard setback line.
In case no. 2140042, the Ches-nuts appealed from a summary judgment entered by the Madison Circuit Court (insofar as it presided over the administrative appeal, we refer to the Madison Circuit Court as “the circuit court”) in favor of the BZA arising out of an administrative appeal filed by the Chesnuts. Apparently, out of an abundance of caution that their argument regarding the exhaustion of administrative remedies might not be well taken, the Chesnuts filed an administrative appeal with the BZA on July 31, 2013. The Chesnuts’ appeal to the BZA involved the same facts and issues raised in their complaint filed on June 3, 2013. Ultimately, the BZA determined that the Chesnuts’ administrative appeal was untimely and ruled against the Chesnuts, and the Ches-nuts appealed to circuit court pursuant to § 11-52-81, Ala.Code 1975. This case was assigned to a different circuit judge than was the Chesnuts’ complaint filed on June 3, 2013.[1]
*635 When the trial court entered a summary judgment in favor of the City and the builders on March 14, 2014, the Chesnuts’ appeal of the BZA’s decision in their administrative appeal was resolved. That is, there was nothing for the circuit court to address once a summary judgment was entered on the merits of the Chesnuts’ claims involving the front-yard setback lines. The dispute over the interpretation of the zoning ordinance had been adjudicated.[2]
Res judicata is a judicially created doctrine that precludes the relitigation of matters that have been adjudicated or that could have been adjudicated in the prior action. Lee L. Saad Constr. Co. v. DPF Architects, P.C., 851 So.2d 507 (Ala.2002). The elements of res judicata are “ ‘(1) a prior judgment on the merits, (2) rendered by a court of competent jurisdiction, (3) with substantial identity of the parties, and (4) with the same cause of action presented in both actions.’” Chapman Nursing Home, Inc. v. McDonald, 985 So.2d 914, 919 (Ala.2007)(quoting Equity Res. Mgmt., Inc. v. Vinson, 723 So.2d 634, 636 (Ala.1998)).
In the present case, the March 14, 2014, summary judgment in the civil action was a final judgment for res judica-ta purposes: The pending appeal of the summary judgment in the civil action did *636 not affect the finality of the judgment. A judgment will operate as res judicata notwithstanding an appeal when the appellate-court review is based on the record made below. Cashion v. Torbert, 881 So.2d 408 (Ala.2003). The circuit court has jurisdiction over zoning matters. See Budget Inn of Daphne, Inc. v. City of Daphne, 789 So.2d 154 (Ala.2000)(explaining that the exhaustion of administrative remedies is a judicially created doctrine and not one involving subject-matter jurisdiction). The parties are substantially the same in both actions — the civil action involves the City, and the administrative appeal involves the BZA, an agency of the City. Both causes of action involve the interpretation of the City’s zoning ordinances. Accordingly, the Chesnuts’ administrative appeal to the BZA is barred by the doctrine of res judicata.
We now turn to the appeal in case no. 2140043 involving the summary judgment entered in the civil action in favor of the builders and the City on March 14, 2014. We agree with the Court of Civil Appeals that the March 14, 2014, order was a final, appealable judgment. Chesnut, 208 So.3d at 612. As discussed in the Court of Civil Appeals’ opinion, the builders were not precluded from voluntarily dismissing their counterclaims. There was no need for the trial court to enter an order granting the builders’ motion to voluntarily dismiss their counterclaims because the issues raised in the builders’ counterclaims had not been “joined” under Rule 41, Ala. R. Civ. P., at the time the trial court entered its March 2014 summary-judgment order. Chesnut, 208 So.3d at 616.
As to the merits of the summary judgment entered on March 14, 2014, it is well settled that a motion for a summary judgment may be granted only where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Rule 56, Ala. R. Civ. P.; Wilbanks v. United Refractories, Inc., 112 So.3d 472 (Ala.2012). Where all the basic facts are undisputed and the matter is one of interpretation or of reaching a conclusion of law by the court, a summary judgment may be appropriate. Bible Baptist Church v. Stone, 55 Ala.App. 411, 316 So.2d 340 (1975). Statutory interpretation — particularly interpretation of the effect of a statute where the facts are undisputed — is primarily a legal question amenable to summary judgment. Continental Nat’l Indem. Co. v. Fields, 926 So.2d 1033 (Ala.2005). When the facts are undisputed, this Court reviews de novo the trial court’s interpretation of statutory language.
In the present case, the trial court entered a summary judgment in favor of the builders and the City on the Chesnuts’ claim that the building permits were issued in violation of the City’s zoning ordinances. In Ball v. Jones, 272 Ala. 305, 309-10, 132 So.2d 120, 123 (1961), this Court held:
“A city or municipal corporation does not have the inherent power to enact and enforce zoning regulations. White v. Luquire Funeral Home, 221 Ala. 440, 129 So. 84 [(1930)]; Leary v. Adams, 226 Ala. 472, 147 So. 391 [(1933)]; Alabama Alcoholic Beverage Control Board v. City of Birmingham, 253 Ala. 402, 44 So.2d 593 [(1950)]. Municipal corporations were granted the power and authority to enact comprehensive zoning ordinances under Code 1940, Tit. 37, §§ 772-773 [now § 11-52-70 et seq., Ala.Code 1975]. This court in Marshall v. City of Mobile, 250 Ala. 646, 35 So.2d 553 [(1948)], recognized the well-known rule that municipal authorities act in a legislative capacity in the enactment of zoning ordinances. Also, the amend *637 ment to a comprehensive zoning ordinance or a rezoning of a certain area ... becomes a part of the existing comprehensive ordinance and, a fortiori, is a legislative act. Phillips v. City of Homewood, 255 Ala. 180, 50 So.2d 267 [(1951)].”
In Ferraro v. Board of Zoning Adjustment of Birmingham, 970 So.2d 299, 303 (Ala.Civ.App.2007), the Alabama Court of Civil Appeals held:
“In Alabama, like many other states, eities[ ] and other municipal corporations do not have the inherent power to enact and enforce zoning regulations. Swann v. Board of Zoning Adjustment of Jefferson County, 459 So.2d 896, 898 (Ala.Civ.App.1984). Municipal corporations in Alabama do have the power to enact comprehensive zoning ordinances under enabling acts passed by our legislature, but any ‘zoning ordinances which are enacted under this delegated legislative authority must be enacted pursuant to, and in substantial conformity with, the enabling act.’ Id. (citing Lynnwood Prop. Owners v. Lands Described in Complaint, 359 So.2d 357 (Ala.1978)).”
Section 11-52-70, Ala.Code 1975, allows a municipality to adopt “such ordinances as necessary to carry into effect and make effective the provisions of this article,” thereby vesting the municipality with the legislative authority to zone land within its corporate boundaries. Section 11-52-71, Ala.Code 1975, allows the “local legislative body” to divide the municipality into districts and to “regulate and restrict the erection, construction, reconstruction, alteration, repair, or use of buildings, structures, or land.” Section 11-52-71 further provides that “[a]ll such regulations shall be uniform for each class or kind of buildings throughout each district, but the regulations in any one district may differ from those in other districts.” Section 11-52-73, Ala.Code 1975, provides that the local legislative body is empowered to regulate and restrict the size of buildings and “the size of yards.”
Section 11-52-79, Ala.Code 1975, provides that the local legislative body may appoint a zoning commission “to recommend the boundaries of the various original districts and appropriate regulations to be enforced therein.” Section 11-52-80, Ala.Code 1975, allows the local legislative body to appoint a board of adjustment and to “provide that the said board of adjustment shall in appropriate cases and subject to appropriate conditions and safeguards make special exceptions to the terms of the ordinance in harmony with its general purposes and interests and in accordance with general or specific rules therein contained.”
The legislature granted the local legislative body, here, the Huntsville City Council, the authority to enact and amend zoning ordinances. The City has a zoning commission and a board of zoning adjustment. The City adopted its first zoning-ordinance code in 1963. In 1989, the City reorganized and recompiled its zoning ordinances, and the zoning ordinances include all the amendments to date.
■This Court has set forth the standard for interpreting municipal ordinances, as follows:
“City ordinances are subject to the same general rules of construction, as are acts of the Legislature. S & S Distrib. Co. v. Town of New Hope, 334 So.2d 905 (Ala.1976). In John Deere Co. v. Gamble, 523 So.2d 95, 99-100 (Ala.1988), this Court, quoting Clark v. Houston County Comm’n, 507 So.2d 902, 903-04 (Ala.1987), set out the following general rules of statutory construction, which also apply to the construction of municipal ordinances:
*638 “ ‘ “The fundamental rule of statutory construction is to ascertain and give effect to the intent of the [city council] in enacting the [ordinance]. Advertiser Co. v. Hobbie, 474 So.2d 93 (Ala.1985); League of Women Voters v. Renfro, 292 Ala. 128, 290 So.2d 167 (1974). If possible, the intent of the [city council] should be gathered from the language of the [ordinance] itself. Advertiser Co. v. Hobbie, supra; Morgan County Board of Education v. Alabama Public School & College Authority, 362 So.2d 850 (Ala.1978). If the [ordinance] is ambiguous or uncertain, the court may consider conditions which might arise under the provisions of the [ordinance] and examine results that will flow from giving the language in question one particular meaning rather than another. Studdard v. South Central Bell Telephone Co., 356 So.2d 139 (Ala.1978); League of Women Voters v. Renfro, supra.” ’ ”
Ex parte City of Orange Beach Bd. of Adjustment, 833 So.2d 51, 55-56 (Ala.2001).
The City, in adopting its zoning ordinances, set out the purpose of those ordinances, which provides, in pertinent part:
“[T]o provide for the establishment of districts within the corporate limits of the City of Huntsville, Alabama; to regulate within such districts the heights, number of stories, size of buildings and other structures; the percentage of lots that may be occupied; the size of yards and other open spaces; the density of population; the location and use of buildings, structures, and land for trade, industry, residence, or other purposes; to provide methods of administration of this ordinance; to provide for penalties for the violation thereof; and to repeal all existing zoning ordinances except those referring to fire zones and airport obstruction zones.
[[Image here]]
“Whereas, the Planning Commission had divided the City into districts and has prepared regulations pertaining to such districts in accordance with a comprehensive plan and design to lessen congestion in the streets; to secure safety from fire, panic, and other dangers; to promote health and general welfare; to provide adequate light and air; to prevent the overcrowding of land; to avoid undue concentration of population; to facilitate the adequate provision of transportation, water, sewage, schools, parks, and other public requirements; and
“Whereas, the Planning Commission has given reasonable consideration, among other things, to the character of the districts and their peculiar suitability for particular uses, with a view to conserving the value of buildings and encouraging the most appropriate use of land throughout the municipality.”
Article 12.2.4 of the City’s zoning ordinances mandates a 30-foot minimum front-yard depth. Article 12.2 expressly provides for an exception to the 30-foot minimum front yard “as provided for in Article 73.” Article 73 of the zoning code, specifically, Article 73.7.4, addresses front yards. Article 73.7.4 provides:
“Where the developed lots within one hundred (100) feet on the same side of the street of any undeveloped lot have a greater or lesser front yard than required herein, the front yard of such undeveloped lot shall be within five (5) feet of the average front yard; provided no front yard shall be less than twenty (20) feet except in a Residence 1-C district, and further provided this section shall not apply to lots fronting on major *639 streets as established by the Major Street Plan.”
(Emphasis added.)
Here, the zoning-enforcement coordinator concluded that, in his opinion, Article 73.7.4 did not apply in this case because he determined that the lot was a “developed” lot and not an “undeveloped” lot based on the facts that “a single family residence had existed on said lot previously and ... sewer and water utility connections [existed] on the lot at the time.” The zoning-enforcement coordinator issued a building permit that allowed the house to be built in accordance with the 30-foot setback line of Article 12.2.4. The other front yards on the street have an average front-yard setback line of approximately 50 feet.
The City zoning ordinances provide that, in applying the regulations authorized by the zoning ordinances, the regulations within each district shall be minimum regulations and shall apply uniformly “to each class or kind of structure or land and particularly ... [that] no building or structure or part thereof shall hereafter be erected, constructed, reconstructed, moved or structurally altered unless in conformity with all of the regulations herein specified for the district in which it is located.” Article 1.2.1. Article 1.2.2 provides that “[n]o building or other structure shall hereafter be erected or altered ... to have narrower or smaller rear yards, front yards, or side yards, than herein required or in any other manner contrary to the provisions of this ordinance.” Article 1.3 provides that, in interpreting a zoning ordinance, “[w]herever the requirements of this ordinance are at variance with the requirements of any other lawfully adopted rules, regulations, or ordinances, the most restrictive or that imposing the higher standards shall govern.”
Article 3.1 defines the terms “yard,” “front yard,” “rear yard,” and “side yard.” Front, rear, and side yards are the yards in front of the building, behind the building, and on the sides of the building, respectively. A “yard” is defined as
“an open space other than a court, unoccupied and unobstructed by any structure or portion of a structure from thirty-six inches (36”) above the general ground level of the graded lot upward (except as otherwise provided by these regulations), provided however, that fences and walls may be permitted in any yard subject to any height limitations established herein, and further provided that poles, posts, and other customary yard accessories, ornaments and furniture shall be permitted in any required yard if they do not constitute substantial impediments to free flow of light and air across the yard to adjoining properties. Ordinary projections of window sills, belt courses, chimneys, cornices, eaves and similar architectural features, and air conditioners or similar appliances, shall not project more than two (2) feet into any required yard, and no support for a roof shall be based in any required yard.”
In light of the fundamental rule of statutory construction in ascertaining and giving effect to the intent of the governing body that enacted the ordinance, we conclude that Article 73.7.4 applies to the front-yard setback for the lot in question. The clear intent of the City Council in adopting Articles 12.2.4 and 73.7.4 is to provide that front yards in a single area have conforming setback lines. The house in question is being “erected,” “constructed,” “reconstructed,” or “structurally altered” on a street where there are existing houses. The language in Article 73.7.4 is intended to ensure that the setback line of the front yard in the “new” house conforms with the setback lines of the existing houses on the street.
*640 This interpretation comports with the stated purpose of the City’s zoning ordinances, of which conforming front-yard setback lines are a part, to regulate the size of yards and open spaces, to provide adequate light and air, and to conserve property values. It also comports with the definition of “yard” in Article 3.1 as an open space, unobstructed by any structure or portion of a structure, permitting in a yard only those yard accessories that do not constitute substantial impediments to the free flow of light and air across the yard to adjoining properties. Other provisions in Article 73.7 concerning yards are consistent with the application of the front-yard setback line in Article 73.7.4. Article 73.7.1 provides that space in any required yard shall be open and unobstructed except for ordinary architectural features such as, for example, windows and chimneys. Article 73.7.2 includes a covered porch or carport as part of a building for the purposes of determining the size of a yard or lot coverage, and Article 73.7.3 includes covered terraces.
“It is this Court’s responsibility to give effect to the legislative intent whenever that intent is manifested. State v. Union Tank Car Co., 281 Ala. 246, 248, 201 So.2d 402, 403 (1967). When interpreting a statute, this Court must read the statute as a whole because statutory 'language depends on context; we will presume that the Legislature knew the meaning of the words it used when it enacted the statute. Ex parte Jackson, 614 So.2d 405, 406-07 (Ala.1993). Additionally, when a term is not defined in a statute, the commonly accepted definition of the term should be applied. Republic Steel Corp. v. Horn, 268 Ala. 279, 281, 105 So.2d 446, 447 (1958). Furthermore, we must give the words in a statute their plain, ordinary, and commonly understood meaning, and where plain language is used we must interpret it to mean exactly what it says. Ex parte Shelby County Health Care Auth., 850 So.2d 332 (Ala.2002).”
Bean Dredging, L.L.C. v. Alabama Dep’t of Revenue, 855 So.2d 513, 517 (Ala.2003).
The Court of Civil Appeals correctly notes that a reviewing court will accord an interpretation placed on a statute or an ordinance by an administrative agency charged with its enforcement great weight and deference. Notwithstanding this rule of construction, however, where the language of the statute or ordinance is plain, this Court will not blindly follow an administrative agency’s interpretation but will interpret the statute to mean exactly what it says. Farmer v. Hypo Holdings, Inc., 675 So.2d 387, 390 (Ala.1996). “Although a court should give deference to an agency’s interpretation of an agency rule or a statute implemented by the agency, that deference has limits. When it appears that the agency’s interpretation is unreasonable or unsupported by the law, deference is no longer due.” Alabama Dep’t of Revenue v. American Equity Inv. Life Ins. Co., 169 So.3d 1069, 1074 (Ala.Civ.App.2015).
One of the reasons courts defer to an administrative agency’s interpretation is to ensure uniformity of decisions in light of the agency’s specialized competence in the field of operation entrusted to it by the legislature. Hamrick v. Alabama Alcoholic Beverage Control Bd., 628 So.2d 632 (Ala.Civ.App.1993). However, in the present case, there is no showing that the zoning-enforcement coordinator’s interpretation was based on any long-standing interpretation by the BZA of the ordinances governing front-yard setbacks.
This is not a case where the agency’s interpretation is reasonable, even though it may not appear as reasonable as some other interpretation. See Affinity Hosp., *641 LLC v. St. Vincent’s Health Sys., 129 So.3d 1022 (Ala.Civ.App.2012)(deferring to the agency’s interpretation). Here, the zoning-enforcement coordinator’s interpretation contravenes the clear intent of Article 73.7.4. As Professor Snoe explained in his well reasoned analysis in his affidavit submitted by the Chesnuts in opposition to the City and the builders’ summary-judgment motion:
“[I]t is my opinion that Article 73.7.4 applies to the lot.... The house is being ‘erected, constructed, reconstructed, ... or structurally altered.’ Not applying [Article] 73.74 means a building could be erected or altered to cause front yards to be narrower or smaller than required under the ordinance; and contrary to the ordinance’s intent that all buildings in close proximity on the same side of a street have conforming front yard setbacks.

“Article 73.74’s mention of ‘undeveloped’ in its ordinary usage means without a structure. Otherwise a person could build a ten foot by ten foot structure on the lot, tear it down and build a house that sits 20 feet or more closer to the street than neighboring homes, or build it and later add an extension into the prohibited area, basically flaunting the intent of the ordinance.

“Article 73.7.4 should be read to be consistent with other provisions of Article 73.7. Those provisions strictly prohibit construction in open yards. For example, section 73.7.1 on projecting architectural feature provides, ‘The space in any required yard shall be open and unobstructed except for the ordinary projections of window sills, belt courses, cornices, eaves, chimneys and other architectural features provided that such features shall not project more than two feet into any required yard.’ Likewise, Article 73.7.2 prohibits any porch or carport having a roof in the prohibited area. Article 73.7.3 prohibits paved terraces with roof and walls or other enclosures in the yards. These provisions are consistent with Article 3’s definition of ‘yard’ as being open space, unobstructed by any structure or portion of a structure, and permitting only those customary yard accessories that do not constitute substantial impediments to free flow of light and air across the yard to adjoining properties.
“In my opinion, this is not a close call. The City Council intended that homes should have conforming front yard setbacks. Undeveloped as used in Article 73.74 means yet to be developed in its proposed state and allowing a residence to be constructed in violation of this Article created a front yard that does not comply with the expressed goals and provisions of the City of Huntsville Zoning Ordinance.... ”
(Emphasis added.)
The zoning-enforcement coordinator took the term “developed” in Article 73.7.4 out of context. The use of a particularized dictionary for urban planning to define the term “developed” was erroneous in light of (1) the purpose of the enabling act delegating to municipalities legislative authority to enact zoning ordinances with the general purpose of considering “the character of the district and their peculiar suitability for particular uses and with a view to conserving the value of buildings,” (2) the zoning scheme adopted by the City, and (3) the language used in Article 73.7.4. The zoning-enforcement coordinator’s interpretation allowed the house in question to be built approximately 20 feet closer to the street than other existing houses on the street. The deference given an administrative agency’s interpretation of its own rule or regulation is not boundless. Accordingly, the trial court erred in entering *642 a summary judgment in favor the builders and the City.[3]
Based on the foregoing, we reverse the judgment of the Court of Civil Appeals in case no. 2140043 because the zoning-enforcement coordinator’s interpretation of the zoning ordinance was unreasonable. We affirm the judgment of the Court of Civil Appeals in case no. 2140042 because the summary judgment and the Court of Civil Appeals’ affirmance of that judgment were appropriate, not because the Ches-nuts’ appeal was untimely but because the Chesnuts’ administrative appeal was barred by the doctrine of res judicata. See Liberty Nat’l Life Ins. Co. v. University of Alabama Health Servs. Found., P.C., 881 So.2d 1013, 1020 (Ala.2003) (noting that, assuming the absence of due-process constraints, this Court may “affirm the trial court on any valid legal ground presented by the record, whether that ground was considered, or even if it was rejected, by the trial court”). We remand this case to the Court of Civil Appeals for proceedings consistent with this opinion.
AFFIRMED IN PART; REVERSED IN PART; AND REMANDED.
STUART, PARKER, MAIN, and WISE, JJ., concur.
MURDOCK, J., concurs specially.
MOORE, C.J., concurs in the result,
SHAW and BRYAN, JJ., concur in the result in part and dissent in part.

“ 1 Richard Chesnut is an attorney who practices in Huntsville. When the civil action was filed, all the Madison circuit judges recused themselves. A retired judge from another circuit was appointed to preside over the civil action.

“ 2 Once again, because Richard Ches-nut practices law in Madison County, all the Madison circuit judges recused themselves. A judge from another circuit was appointed to preside over the administrative appeal.”

“ 3 Article 91.1 of the zoning code provides that the zoning code ‘shall be administered and enforced by the administrative official designated’ by the zoning administrator. Thus, the code provides the authority for McGuffey to issue the permits at issue in his role as zoning-enforcement coordinator,”

“ 4 There is no allegation that the builders did not comply with notice requirements before seeking the permits.”

. The Chesnuts' administrative appeal was unnecessary. The Chesnuts correctly asserted in their complaint filed on June 3, 2013, that they were not required to exhaust administrative remedies in this zoning matter. It is well settled in Alabama that the general principle of “exhaustion of administrative remedies” applies to zoning matters. City of Gadsden v. Entrekin, 387 So.2d 829, 833 (Ala.1980)(holding that “one must exhaust his remedies in a zoning matter before entering a court of law”); Watson v. Norris, 283 Ala. 380, 217 So.2d 246 (1968). However, exhaustion of administrative remedies is a judicially imposed prudential limitation, not an issue of subject-matter jurisdiction. Furthermore, certain exceptions exist to the general rule of exhaustion of administrative remedies;
“The doctrine does not apply when (1) the question raised is one of interpretation of a statute, (2) the action raises only questions *635 of law and not matters requiring administrative discretion or an administrative finding of fact, (3) the exhaustion of administrative remedies would be futile and/or the available remedy is inadequate, or (4) where there is the threat of irreparable injury-”
Ex parte Lake Forest Prop. Owners' Ass’n, 603 So.2d 1045, 1046-47 (Ala.1992) (citing City of Gadsden v. Entrekin, supra). The Chesnuts’ action falls within an exception to the doctrine of exhaustion of administrative remedies. This case involves an interpretation of a zoning ordinance and presents a question of law; thus, the trial court had jurisdiction over the Chesnuts' complaint, and the defense of the exhaustion of administrative remedies did not apply.

. The BZA recognized that the dispute over the interpretation of the zoning ordinance was resolved because it filed a motion in the circuit court to dismiss the Chesnuts’ administrative appeal, arguing that the March 14, 2014, summary judgment ended the controversy. Although the BZA argued that the Chesnuts’ administrative appeal was moot, the substance of its motion was that there had been a judgment involving the same parties and the same controversy. In Myer v. Americo Life, Inc., 469 F.3d 731, 733 (8th Cir.2006), the United States Court of Appeals for the Eighth Circuit discussed mootness and res judicata as follows:
"Americo argues that Myer’s appeal is now moot because the Texas state court has confirmed the arbitration award and that decision is res judicata of the underlying issues in this case. This appeal is not moot, however, because Myer indicated at oral argument that he would appeal the Texas state court's decision. The current controversy therefore ‘remains live.’ Exxon Mobil Corp. v. Saudi Basic Indus. Corp., 544 U.S. 280, 291 n. 7, 125 S.Ct. 1517, 161 L.Ed.2d 454 (2005)(appeal not moot despite fact that state courts had fully resolved same claims as those presented in federal lawsuit, because losing party indicated that it would appeal the state Supreme Court’s decision to the United States Supreme Court).
"Nevertheless, it is clear that res judicata now presents an insurmountable hurdle for Myer’s claims. The Texas state court had issued a final judgment confirming the arbitration award, and that action involved the same parties and the same issues as the instant case. Notably, Myer specifically asked the Texas state court to vacate the arbitration award, and the court expressly denied that motion when rendering its final judgment. Accordingly res judicata now bars Myers from litigating these same issues in federal court (or elsewhere). See, e.g. Amstadt v. United States Brass Corp., 919 S.W.2d 644, 652 (Tex. 1996) (elements of res judicata are (1) prior final judgment on the merits by court of competent jurisdiction, (2) identity of parties, and (3) second action based on same claims as first action or claims that could have been raised in first action).”

. In his dissent, Justice Bryan notes that “construction” on the house began in January 2013 and that the Chesnuts filed their complaint in June 2013. However, the foundation passed inspection in April 2013, and the Chesnuts contacted the City’s zoning department in May 2013. It was not until framing went up that the Chesnuts believed that there was a zoning violation. The Chesnuts did not receive notice that the builders applied for a building permit or that the foundation had passed inspection or regarding any other part of the building process. Unless the City requires a builder to apply for a variance, the adjoining landowners are not given notice. A variance would have required both notice and a vote of the members of the BZA. The zoning-enforcement coordinator is not a member of the BZA and does not have the power to grant waivers or variances under the zoning ordinances. Article 91.1 provides: "The Zoning Administrator shall administer this ordinance in accordance with its literal terms and shall not have the power to permit any construction or use or any change of use which does not conform to this ordinance.” As far as adding on to existing houses as referred in the dissent, those homeowners would need to seek a variance. Lastly, the remedy for the violation here is not before this Court. Furthermore, it does not follow that every zoning violation would result in a tear-down order.